## COMMONWEALTH vs. JOHN K. MULICA, JR.

Essex.   December 7, 1987. — March 9, 1988.

Present: WILKINS, LIACOS, NOLAN, & LYNCH, JJ

*Insanity. Practice, Criminal,* Instructions to jury. *Evidence,* Film, Judicial discretion.

In a criminal case in which the defendant, charged with embezzlement from a bank and related crimes, presented evidence of his lack of criminal responsibility, the judge's supplemental instructions in response to a question from the jury improperly limited the jury's consideration to a specific medical diagnosis and precluded their consideration of all the proffered evidence of psychological disturbance that could create a reasonable doubt concerning the defendant's criminal responsibility. [818-819]

The fact that a criminal defendant pursues a focused trial strategy which adopts a particular theory or diagnosis of mental incapacity in order to raise a reasonable doubt as to his criminal responsibility does not limit or narrow the prosecution's burden of proving that the defendant was legally responsible for his conduct. [819-820]

At the retrial of a criminal case, the judge was to consider the purposes for which the defendant was offering a film in evidence and the degree to which visual evidence might aid the jury in understanding the defense theory presented. [820-821]

INDICTMENTS found and returned in the Superior Court Department on April 20, 1983.

The cases were tried before *Hiller B. Zobel,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Thomas G. Shapiro* for the defendant.

*Robert J. Bender,* Assistant District Attorney, for the Commonwealth.

LYNCH, J. The defendant was convicted of embezzlement from the Newburyport Five Cents Savings Bank (bank), of procuring a bank employee fraudulently to convert money of the bank, and of aiding that bank employee to falsify bank rec-

ords, in violation of G. L. c. 266, §§ 52 and 53A (1986 ed.). On appeal, the defendant contends that supplemental jury instructions concerning criminal responsibility and the exclusion of certain documentary films constituted reversible error. We transferred the case to this court on our own motion and now reverse his judgments of conviction and order a new trial.

1. *Criminal responsibility.* A cash audit of the bank in December, 1982, disclosed a shortage of $204,000. The defendant, who had recently resigned as a vice president and a trustee of the bank, was charged with taking the money. The defendant testified on his own behalf and admitted his role in taking the funds during a period spanning approximately October, 1980, to December, 1982. However, he presented evidence of lack of criminal responsibility which he contended was attributable to a mental condition known as post-traumatic stress disorder (PTSD).[1] To place the issues before us on appeal in their proper context, we relate the evidence offered to support the defense theory in some detail.

The defendant described particular combat experiences during his service as an eighteen year old Marine machine gunner in Vietnam in 1966 and 1967, which involved witnessing the gruesome deaths of numerous friends and fellow members of his company. A cousin with whom he was close also was killed. He further testified to sleep difficulties and recurrent memories and nightmares since his return from Vietnam, problems which intensified beginning in 1979. Also beginning around 1978, the defendant accumulated six to eight guns which he kept in his bedroom. Since resigning from the bank, the defendant had been treated with Thorazine, Stelazine, and Dalmane, and had been awarded disability benefits by the Veterans' Administration for PTSD. Of especial relevance to the issues on appeal, the defendant testified that he had spent the

[1] The diagnostic criteria relied upon at trial are provided by The Diagnostic and Statistical Manual of Mental Disorders (3d ed. 1980) (DSM-III). The Diagnostic and Statistical Manual of Mental Disorders (3d ed. rev. 1987), sets forth modifications of these criteria. For an overview of the history, clinical understanding, and legal relevance of this diagnostic category, see Erlinder, Paying the Price for Vietnam: Post-Traumatic Stress Disorder and Criminal Behavior, 25 B.C.L. Rev. 305 (1984), and sources cited therein.

entire amount taken from the bank on daily gambling at The Yankee Greyhound dog track in Seabrook, New Hampshire. According to the defendant, he bet up to $2,000 a day. He described his experience while at the racetrack as one of being "back in the action . . . a very hyped up intense feeling." He had begun gambling on a daily basis sometime around 1980.

Additional testimony by the defendant's life-long friends portrayed the defendant upon his return from Vietnam as a changed person who had become nervous, irritable, and agitated. His agitation apparently subsided, but reemerged in 1979 or 1980.

It was part of the defense theory that the defendant's emotional difficulties, as manifested in intensifying problems with agitation, sleeping, gambling, and drinking, were precipitated by his promotion in 1979 to bank vice-president and the particular psychological meaning this promotion held for him. The defendant's estranged wife testified that the defendant felt compelled to gamble and "would be really wound up" upon his return from the dog track. She further testified about his agitation, sleep difficulties, and the fact that through the fourteen years she was with the defendant, from 1968 to 1982, he slept with his eyes open and feet constantly tapping. Two employees of the dog track testified respectively that the defendant was "the strangest bett[o]r" who consistently bet in a manner that would ensure that he lost money and that he gave away money to various people at the track.

The defendant also presented two expert witnesses who diagnosed the defendant as suffering from PTSD and who explained how the above-noted constellation of behavior or symptoms was indicative of PTSD. They viewed these symptoms, as well as the defendant's embezzling, as manifestations of and attempts to manage emotionally overwhelming feelings resulting from his Vietnam experiences. Dr. John P. Wilson, a psychologist who has treated PTSD among many Vietnam veterans, testified that both the gambling and embezzling were expressions of self-destructive feelings stemming primarily from the psychological dynamics of survivor guilt and attendant feelings of depression and worthlessness. These dynamics, Dr.

Wilson believed, led the defendant to embezzle and gamble self-destructively in order to be caught and punished. Dr. Wilson viewed the gambling as serving the additional psychological function of making the defendant feel intensely alive and aroused so as to ward off depression and recurrent images of his combat experiences.

Dr. Sheldon D. Zigelbaum, the defendant's treating psychiatrist since 1982 and a specialist in the treatment of PTSD, testified similarly that the defendant suffered from PTSD. He elaborated that the defendant's compulsion to gamble, which he viewed as a symptom of PTSD, served to recreate, in an unconscious attempt to finally gain relief from, the Vietnam experience of risk and danger. Dr. Zigelbaum viewed the defendant's embezzling also as an escalation of a pattern of risk taking conduct previously evidenced by striving for promotions, speculating in real estate, maintaining an extramarital affair, and more moderate gambling. Both expert witnesses were of the opinion that the defendant lacked substantial capacity to restrain himself from taking the bank's funds as a result of PTSD.

In his opening statement, the prosecutor argued to the jury, inter alia, that the defendant began embezzling in October, 1980, "as a result of gambling." Accordingly, he cross-examined the defendant's expert witnesses in an apparent effort to discredit their diagnoses of PTSD and instead to suggest to the jury that the defendant's embezzling, if related to any emotional defect at all, was related solely to a problem with compulsive gambling.[2]

From Dr. Zigelbaum, the Commonwealth elicited testimony that the defendant met the diagnostic criteria for the separate

[2] The Commonwealth argued at trial that pathological gambling should not be recognized as a mental disease or defect causing lack of criminal responsibility. Our view of this case renders this issue immaterial. It also should be noted that the Commonwealth has apparently abandoned its argument, advanced at trial, that PTSD should not be deemed to constitute legal insanity. Since it is not argued to the contrary, we are content to assume that it was open to the jury to find that the defendant suffered from a mental disease or defect which could be characterized as PTSD. See *Commonwealth v. Laliberty*, 373 Mass. 238, 242 (1977).

DSM-III category for pathological gambling. On redirect examination, the witness clarified that individuals may descriptively meet the criteria for more than one diagnostic category but that the proper diagnosis depends upon an understanding of the underlying dynamics rather than the most immediate or florid symptoms.

The judge's initial instructions on criminal responsibility were in accordance with the defendant's requests and the law under *Commonwealth* v. *McHoul,* 352 Mass. 544 (1967); the defendant did not object to that charge.[3] During the course of deliberations, however, the jury asked the question: "With regard to a plea of not guilty by reason of insanity, would pathological gambling be perceived by the law as a valid form of insanity?" A lengthy bench conference ensued in which the Commonwealth reiterated its position, arguably adopted by the judge, that pathological gambling was not, as a matter of law, a mental disease or defect causing inability to conform to the requirements of the law. The defendant urged reinstruction on

---

[3] In pertinent part the judge instructed as follows: "The question is, was the defendant, at the time that he performed the various activities in connection with the bank and the bank's money, was he afflicted by or suffering from a mental defect or disease, which caused him to lack substantial capacity to conform his conduct to the requirements of the law? The Government says no. The Government says, he wasn't suffering from a mental defect or disease, and even if he was, this mental defect or disease didn't cause him to lack substantial capacity to conform his conduct to the requirements of the law. The Government has to prove its position. And it has to prove its position beyond a reasonable doubt. So the thing that you want to keep in mind is, the defendant doesn't have to prove his state of mind, or the condition of his mind, the Government has to prove it. . . . Now, a mental defect or disease means this, in the present circumstances, it means an abnormal condition of the mind which substantially affects the mental processes. If it doesn't substantially affect the mental processes, then it's not a mental defect or disease. The Government also says, even if he had that kind of condition, it didn't cause a lack of substantial capacity to conform his conduct to the law. Substantial, in this context, means neither maximum nor minimum, certainly not total.

"  . . . .

"You don't have to decide whether [the defendant] lacked the capacity to control his behavior in all respects. The question is whether he was, as a result of mental disease or defect, deprived of substantial capacity to conform his behavior, with respect to the incidents that are involved here, to the requirements of the law."

the definition of mental disease or defect and the government's burden of proof, arguing that the expert witnesses' rejection of the particular diagnosis of pathological gambling, as applied to the defendant, did not preclude jury consideration of evidence about gambling in their deliberations regarding criminal responsibility. Ultimately, the judge advised the jury that he would not answer the question directly and gave the following supplemental instruction: "There is [in this case] a question whether the Government has proved beyond a reasonable doubt that the defendant was not, at the time of the embezzlement, which went on as you have heard, over a period of time, whether during that time, he was not suffering from a mental disease or a defect . . . or that mental disease or defect was not the cause of his inability to conform his conduct to the law. *Now, the issue in the case is whether that disease or defect was something called Post-traumatic Stress Disorder, the result of the Vietnam War-experience. That is what the Government has undertaken to prove was not a mental disease or defect. In other words, that the defendant was not suffering from that mental disease or defect.* Now, that mental disease or defect, like other ailments perhaps, if there was — if it was a mental disease or defect, might have different symptoms, different manifestations. So what you have to do is ask yourself, on the basis of the evidence, not on the basis of any guesswork, on the basis of a reasonable doubt that he was not suffering from a mental disease or defect? If you conclude that the Government has proved beyond a reasonable doubt that he was not suffering from a mental disease or a defect, you need inquire no further. If, and the fact that I am instructing you fully, is in no way to be taken as any suggestion of how I think you should or will decide the case, but it's my job to instruct you fully, if you conclude that he was suffering from a mental disease or a defect, then you will examine the evidence, and you will ask, did that mental disease or defect cause him to be unable to conform his conduct with the law? Now, I want to be very clear that you understand that the defendant doesn't have to prove that the mental disease or defect caused the inability to conform his behavior to the law.

The question at that point is, has the Government proved that even though he may have had a mental disease or a defect, that mental disease or defect did not prevent him from conforming his conduct to the requirements of the law." (Emphasis supplied.) The defendant objected to the supplemental instruction on the ground that the Commonwealth's burden was erroneously defined as "proving that the defendant is not suffering from PTSD, as opposed to the instruction that the Government's burden is simply to show . . . he is not suffering from a mental disease or defect."

On appeal, the defendant similarly contends that the supplemental instruction diluted the Commonwealth's burden of proof by charging that the Commonwealth had to prove only that the defendant did not suffer from a particular mental illness, PTSD. It appears to be the Commonwealth's primary argument that the supplemental instruction, read in light of the entire charge, was an accurate statement of the law and that the reference to PTSD was within the judge's discretion "to choose the form of expression best adapted to make the law intelligible to the jurors." *Commonwealth* v. *Silva,* 388 Mass. 495, 507 (1983).

Our review of the charge in its entirety leads us to conclude that the jury could have understood the Commonwealth's burden to be less than that required under *Commonwealth* v. *McHoul, supra* at 548. Nothing in the charge made it clear to the jury that they might reject the specific diagnostic formulation of PTSD, in theory or as applied to the defendant, and at the same time consider all the evidence of psychological disturbance, including, but not limited to gambling, as creating a reasonable doubt concerning the defendant's criminal responsibility. Instead, the instruction could be understood as limiting the jury's choice either to finding the defendant lacking criminal responsibility because of PTSD or finding him guilty. "Moreover, the fact that some of the instructions were correct is not determinative because 'we cannot know whether the jury were guided by the correct or incorrect portion of the instruction.' " *Commonwealth* v. *Nieves,* 394 Mass. 355, 362 (1985), quoting *United States* v. *Green,* 405 F.2d 1368, 1370 (D.C.

Cir. 1968), aff'd, 424 F.2d 912 (D.C. Cir. 1970), cert. denied, 400 U.S. 997 (1971). The error in the charge was not that it may have precluded the jury from finding that pathological gambling constituted legal insanity. The issue of legal recognition of pathological gambling, standing alone, as a defense to criminal responsibility is not relevant on the facts of this case. Rather, where, as here, there was sufficient evidence to raise the issue of lack of criminal responsibility, independent of any particular diagnostic label, contrast *Commonwealth* v. *McInerney*, 373 Mass. 136, 151 (1977), it was for the jury, properly instructed, to consider on the proffered evidence whether a mental disease or defect existed and whether that caused the defendant to lack substantial capacity to conform his conduct to the requirements of the law.

Although we have determined that the supplemental instruction was in error, there remains the difficult question whether a defendant may relieve the Commonwealth of disproving the existence of a mental defect, in the broadest and most general sense, by pursuing a focused trial strategy which adopts a particular theory or diagnosis of mental incapacity. During the evidentiary stage of the proceedings, there can be no dispute that the defense was based on the theory of PTSD. Indeed, defense counsel stated during a bench conference concerning the relevance of evidence of compulsive gambling, "[T]he entire defense case is premised on the Vietnam experience, and the effect that had on [the defendant], and the fact that he has PTSD. And if [the jurors] don't believe that, there's nothing left in the defense case for them to believe." As we noted above, however (*supra* at 818), the issue of the Commonwealth's burden of proof in regard to criminal responsibility was properly preserved at the time of the judge's supplementary instruction. We conclude that the defendant's theory of, and asserted diagnostic label relating to, lack of criminal responsibility does not limit the Commonwealth's burden to prove that he was legally responsible for his conduct. "Although a particular expert's definition of the terms 'mental disease or defect' is helpful to the jury in their finding, the jury are not required to adopt any particular definition as their own in a particular

case." *Commonwealth* v. *Laliberty,* 373 Mass. 238, 242 (1977). Were the so-called "insanity defense" truly a defense in the sense that the defendant bears the risk of nonpersuasion, see *Commonwealth* v. *Sheehan,* 376 Mass. 765, 766 n.1 (1978), we would, of course, deem waived a theory not litigated or argued. Here, we are persuaded that the correct allocation of the burden of proof requires a different result. A defendant who offers evidence, from whatever source, see *Commonwealth* v. *Laliberty, supra* at 245, sufficient to raise doubts concerning his mental competence, see *Commonwealth* v. *McInerney, supra,* should not be required to preserve actively, through argument or introduction of evidence, every conceivable theory of mental disease or defect. Cf. *Commonwealth* v. *McHoul, supra* at 548 (rejecting the suggestion that a "defect in the charge may be overlooked because the evidence did not show conduct that was irresistibly impelled"). Indeed, to bind a defendant to medical or psychiatric expert testimony, proffered for its persuasive value only, would run counter to our view that the term "mental disease or defect" is "not . . . a matter of medical terminology but rather 'to resolve a specific set of legal problems.'" *Commonwealth* v. *Sheehan, supra* at 769 n.5, quoting Model Penal Code § 4.01, at 66 (Proposed Official Draft 1962). Accordingly, where there was sufficient evidence to raise a reasonable doubt concerning the defendant's criminal responsibility, apart from the particular diagnosis of PTSD, the supplemental instruction was too narrowly drawn and, therefore, there must be a new trial.

2. *Exclusion of visual evidence.* Because the issue is likely to arise at a new trial, we address the defendant's contentions concerning the exclusion of evidence. At trial, the defendant offered in evidence a film from the United States Army archives and excerpts from a documentary film with footage of Vietnam during the years 1965 through 1967. At various points in the trial, the defendant alternatively offered the films for two purposes, and it is not entirely clear upon which theory the evidence was excluded. The first asserted basis of admissibility was as evidence illustrating the stresses the defendant underwent in Vietnam, the magnitude of which was relevant to the diagnosis

of PTSD. As part of his offer of proof, the defendant represented that he would testify that the films fairly and accurately represented experiences similar to his own. The second purpose was as a chalk to illustrate Dr. Wilson's explanation of PTSD. Stating that he did not regard the films in the same light as a model serving as a chalk, the judge excluded the films because subjective evaluations are inherent in the filmmaking process and his belief that the defendant's case would not be prejudiced, inasmuch as relevant testimony regarding the defendant's combat experiences would be permitted. This ruling was within the judge's sound discretion. *Commonwealth* v. *Nadworny*, 396 Mass. 342, 366 (1985), cert. denied, 477 U.S. 904 (1986).

In so far as the films were offered as independent evidence of the stresses causing the defendant's asserted mental condition, it was for the judge to make a preliminary factual determination "whether the exhibit is sufficiently verified by proof that it is a true representation of the subject." P.J. Liacos, Massachusetts Evidence 403 (5th ed. 1981). Similarly, in view of the nature of the expert testimony sought to be illustrated by the films, it was within the discretion of the judge to deem the films as outside the scope of what is ordinarily considered a chalk — an aid to the jury in understanding potentially abstruse expert testimony. The experience of combat may be outside the experience of most jurors, but the difficulty in comprehension is not of a scientific or intellectual nature.

We note, however, that it would have been also well within the judge's discretion to admit the films under either theory. See, e.g., *Szeliga* v. *General Motors Corp.*, 728 F.2d 566 (1st Cir. 1984) (no error to admit films in products liability action to illustrate the defendant's theory of the cause of the accident; dissimilarities between experimental and actual conditions affect the weight of the evidence, not its admissibility). In view of the novel nature of the defense, the judge on retrial should exercise his or her broad discretion to consider carefully the purpose for which the evidence is offered and the degree to which visual evidence may aid the jury in understanding the nature of the asserted mental condition.

*Judgments reversed.*

*Verdicts set aside.*