Commonwealth v. Fuller.

COMMONWEALTH vs. JAMIE P. FULLER
(and a companion case[1]).

Essex. October 5, 1995. - November 21, 1995.

Present: LIACOS, C.J., WILKINS, LYNCH, GREANEY, & FRIED, JJ.

*District Court*, Delinquent child. *Delinquent Child. Practice, Criminal*,
    Juvenile delinquency proceeding, Instructions to jury, Witness, Hear-
    say, Capital case. *Statute*, Retroactive application. *Constitutional Law*,
    Ex post facto law. *Mental Impairment. Insanity. Malice. Homicide.
    Witness*, Credibility, Immunity. *Words*, "Mental disease or defect."

There was no merit to the contentions of a defendant convicted of murder
    in the first degree that G. L. c. 119, § 72, as amended by St. 1991,
    c. 488, § 7, should be held applicable retroactively to his case and that
    the matter should be remanded to the juvenile session of the District
    Court for reconsideration of that court's decision to transfer the defend-
    ant for trial as an adult, where no clear language in the statute indi-
    cated a legislative intent that it operate retroactively and where, in any
    event, the ex post facto clauses of the State and Federal Constitutions
    prohibit such retroactive application. [406-410]
At the trial of a first degree murder indictment, there was no error, consid-
    ering the charge as a whole, in the judge's instructions to the jury with
    respect to the term "mental disease or defect," in language following
    that in *Commonwealth* v. *McHoul*, 352 Mass. 544 (1967). [410-412]
Where a jury found a defendant guilty of murder in the first degree by
    reason of deliberately premeditated malice aforethought and the evi-
    dence supporting a finding of first prong malice was overwhelming,
    error, if any, in the judge's instruction on third prong malice was irrele-
    vant [412]; for the same reason, the judge's failure to instruct on volun-
    tary manslaughter was not error [413].
At a criminal trial, the judge did not err by failing to caution the jury in
    their evaluation of the credibility of two immunized witnesses, where
    the plea agreements were not offered in evidence and there was no men-
    tion that truthful testimony was a condition of immunity, thus it was
    unlikely that the jury were misled into accepting the veracity of the
    witnesses solely because of their immunization. [413]

[1]Jamie P. Fuller vs. Commonwealth.

Error, if any, at a criminal trial in the judge's exclusion of a certain hear-
say declaration of the defendant that he abused steroids was not preju-
dicial, where there was abundant evidence to that effect before the jury.
[413-414]

No reason appeared on the record of a first degree murder case for this
court to exercise its power under G. L. c. 278, § 33E, to reduce the
verdict or grant a new trial. [414]


INDICTMENT found and returned in the Superior Court De-
partment on July 15, 1992.

The case was tried before *Patti B. Saris*, J.

CIVIL ACTION commenced in the Supreme Judicial Court
for the county of Suffolk on August 1, 1994.

The case was heard by *O'Connor*, J.

*Carol A. Donovan*, Committee for Public Counsel Ser-
vices, for the defendant.

*Elin. H. Graydon*, Assistant District Attorney, for the
Commonwealth.

FRIED, J. This case consolidates an appeal from an order of
a single justice of this court with an appeal from a conviction
of murder in the first degree. The single justice denied
Fuller's motion requesting that the case be remanded to a
juvenile session of the District Court for reconsideration of
that court's decision to transfer the defendant to Superior
Court for trial as an adult. The defendant claims that in
making his decision to transfer, the District Court judge
should have considered the applicability of St. 1991, c. 488,
§ 7, to G. L. c. 119, § 72, requiring confinement of juveniles
convicted of first degree murder for a period of from fifteen
to twenty years. The defendant did not raise this issue at the
transfer hearing. We hold that St. 1991, c. 488, § 7, was not
applicable to the defendant.

The defendant also complains of the trial judge's failure in
her jury instructions to define "mental disease or defect," to
instruct on voluntary manslaughter, to define properly third
prong malice, and to instruct on the credibility of an immu-
nized witness. Defense counsel did not raise these issues at
trial, and we rule that what errors there may have been did

not create a substantial likelihood of a miscarriage of justice.[2] G. L. c. 278, § 33E (1994 ed.). Finally, the defendant claims that the trial judge erred in excluding certain hearsay evidence that he claims might have been favorable to him. We also reject this claim, as we do the defendant's request for a new trial or reduced verdict pursuant to G. L. c. 278, § 33E.

## I.

Jamie Fuller, who was sixteen years old at the time of the incident, brutally killed his fourteen year old girl friend on August 23, 1991. At trial it was not disputed that Jamie Fuller had killed the victim. The principal focus of the evidence offered at trial, particularly the evidence regarding his statements and actions in the days before and after the killing, was directed to the defendant's frame of mind and his responsibility for his actions.

The defendant and the victim had had an intense and troubled romantic relationship for two years preceding the killing. In the last year each had dated other people, and this increased the tension between them. Fuller spoke several times of killing the victim, to her and to others. In the months before the killing, he had discussed with his friends ways for the victim to procure an abortion without her having to obtain parental consent, having someone beat Amy so as to cause a miscarriage, or having her killed. The day before the killing the victim had taken a trip to Gloucester with two girls and two boys. When the defendant learned about this he is reported to have said, "I'm getting sick of this. I swear I'm going to kill her. . . . This shit's got to stop. . . . She won't be around to go out with anyone any more. . . . I'm going to fucking kill her." The next morning he called her repeatedly and insisted that she come to his house to meet him. On the day of the killing, before she arrived, the defendant met Dominic Sciola and later Mark

---

[2]In light of our decision on these claims, we also conclude that counsel's failure to raise them did not deprive Fuller of the effective assistance of counsel. See *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992).

DeMeule. Sciola testified that the defendant said he was going to kill the victim and that he invited Sciola to come along. He later told Mark DeMeule the same thing. When DeMeule taunted him that he "didn't have the balls to do" it, the defendant replied, "You'll see."

The defendant and his two friends met the victim. They were joined by Michael Maillet and briefly by Scott Ward. This group walked out of the defendant's house and along a path into a field. The defendant and the victim separated from the others. The others heard screams, and when the defendant rejoined them he said, "It's done." He was bloody and had "a smirk on his face." He showed the others his knife and said it had broken during the attack. He also said to DeMeule, "The bitch shouldn't have messed with me." DeMeule testified that as the group walked away from the scene Fuller described how he had killed the victim. Fuller reported to the group that "he placed his hand over her mouth and said, 'I love you,' and then stabbed her in the stomach and then got behind her and pushed [so that] he could feel the point [of the knife] hit his stomach. Then he . . . stabbed her in the back and she had tried to pull away and she bit . . . his hand and then she screamed. . . . [S]he tried to run and he grabbed her by her hair and pulled her back and covered her mouth again and then cut her throat. . . . When she was on the ground . . . she kept saying, 'I love you, Jamie,' and she was gargling on her own blood and he said it pissed him off so he stomped on her head."

There was further testimony about Fuller's conduct after the killing. At Sciola's house he washed the blood off his arms, drank red Kool-Aid because it was "right for the occasion," took Maillet to see the body, and then warned his companions that they would "be next" if they "were to say anything." Later that day, Fuller led his friends in the task of disposing of the victim's body. They obtained two trash bags, two cinder blocks, and lobster line (which would not fray in the water), and he and Maillet threw the weighted body into Shoe Pond. Thereafter, he denied knowing the vic-

tim's whereabouts to the police and to his friends and joined in searching for her. Finally, on August 28, five days after the killing, Maillet led the police to the victim's body, and Fuller was arrested. At the time of his arrest, he "put on a half-smile smirk and began to chuckle." During questioning Fuller was calm and accused his friends of killing her.

At trial, the defense made a convincing showing — principally through cross-examination of the Commonwealth's witnesses — that for some time Fuller had been using steroids. He had been small and shy, but one and one-half years prior to the killing he grew quickly and gained some thirty pounds. He began to drink "all the time" and became quarrelsome and aggressive. There was testimony from several witnesses that they had seen him buying what they thought to be steroids and that they had seen him with pills, vials, and hypodermic needles. One witness testified that she had provided Fuller at his request with a hypodermic needle. There was also testimony that his buttocks were sore "[b]ecause of the needle."

Three experts — two psychiatrists and a clinical psychologist — testified on Fuller's behalf. Dr. John Thomas Grisso, a clinical psychologist and professor of psychiatry at the University of Massachusetts, had been appointed by the Department of Youth Services to perform a court-ordered evaluation of Fuller. Fuller had told Grisso about using alcohol and steroids since the age of fourteen years. Based, among other things, on early childhood factors, including the neglect Jamie Fuller had suffered as a child, the abandonment of the family by his father, and his mother's alcoholism and depression, Dr. Grisso testified that Fuller suffered from dysthymia, "a long term, continual lower-level depression." Together with his alcohol consumption this "substantially impaired his ability to appreciate the wrongfulness" of his conduct. Dr. Grisso disclaimed any opinion regarding the effects of steroid use on Fuller's mood, behavior, or mental capacity. On cross-examination, Dr. Grisso conceded that he did not have an opinion "as to whether . . . by reason of mental disease or defect [the defendant] lacked the substantial capacity to ap-

preciate the wrongfulness of killing [the victim]." Ultimately, Dr. Grisso testified that Fuller's mental disease or defect substantially impaired his ability to appreciate the wrongfulness of his conduct, but that Fuller was capable of forming the specific intent to kill.

Dr. Harrison Pope, a psychiatrist at McLean Hospital and an assistant professor of psychiatry at Harvard Medical School, provided the principal testimony regarding Fuller's anabolic steroid use. His physical examination of Fuller confirmed the conclusion, suggested by Fuller's rapid weight gain, that Fuller had been using steroids. He described the psychiatric effects of steroid use and of what he called steroid intoxication. Steroids may cause increased aggression, a brooding irritability, and while they act as an antidepressant, discontinuing their use may result in a rebound depression. He also opined that Fuller was suffering from alcohol dependence and major depressive illness. Based on Fuller's statement to him that he had last taken steroids forty-eight hours before the killing, Dr. Pope stated that "particularly because of [the defendant's] intoxication with the steroids, plus an additional component contributed by the alcohol and the depressive illness, [the defendant was] rendered in a state where he was overwhelmed by a constant obsessional, irritable, jealous rage that he could not counteract in his mind, that he could not say no to, if you wish." This was the basis of his conclusion that Fuller "in fact did lack substantial capacity to conform his conduct to the requirements of the law."

Dr. Marc A. Whaley, a psychiatrist who had performed more than 500 forensic evaluations, testified that at the time of the killing Fuller was suffering from alcohol dependency and dysthymia, a depressive illness which he characterized as a chronic feeling of low self-esteem and self-hatred. Dr. Whaley testified that in his opinion Fuller "was indeed suffering from a mental disease that substantially impaired his capacity to weigh the pros and cons of carrying out his intended acts . . . [and] impaired . . . his capacity to fully appreciate the wrongful magnitude of [his] misconduct." On

cross-examination, however, Dr. Whaley stated that "my opinion would be that he did not lack the substantial capacity either to appreciate the wrongfulness of his conduct or control his conduct by reason of mental disease or defect."

The Commonwealth's rebuttal witness, Dr. Martin Kelly, a psychiatrist on the teaching staff of Brigham and Women's Hospital and a forensic psychiatrist, testified that in his opinion, on the basis of his review of the record and of the expert testimony in the case, Fuller did not suffer from major depression, which he characterized as a mental disease or defect, and that while Fuller abused alcohol he did not suffer from alcohol dependence. Dr. Kelly further testified that based on Fuller's actions on the day of the killing, Fuller "did not describe symptoms . . . [consistent with what happens] when you take steroids. . . . I found no symptoms of either manic symptoms or depressive symptoms that might be related to steroid use . . . ."

## II.
### A.

Fuller's first and most perplexing contention here is that the District Court judge, in deciding whether to transfer Fuller to the Superior Court for trial as an adult, should have considered that Fuller would be subject to the 1991 amendment to G. L. c. 119, § 72,[3] establishing a minimum sentence of fifteen years and a maximum sentence of twenty years for a juvenile adjudicated delinquent by reason of having committed murder in the first degree. Under the amendment, custody is to be transferred from the Department of Youth Services to the Department of Correction after the juvenile reaches the age of twenty-one years. Prior to this revision, such a juvenile would have to be released from custody upon reaching the age of twenty-one years. See G. L. c. 119, § 72 (1990 ed.).

---

[3]The incident in this case occurred in August, 1991. The amendment to § 72 went into effect on December 31, 1991. The District Court held Fuller's transfer hearing in June, 1992.

Under G. L. c. 119, § 61 (1994 ed.), a juvenile must be transferred for trial in the Superior Court if the Commonwealth shows that the juvenile is a danger to the public and that he cannot be rehabilitated within the juvenile justice system. *Commonwealth* v. *A Juvenile*, 413 Mass. 148, 149-150 (1992). The District Court judge in this case found that Fuller presented a serious danger to the public and that he could not be rehabilitated within the juvenile system by the time he turned twenty-one years old, perhaps only three years after the completion of his trial. Accordingly, the District Court judge transferred Fuller for trial in the Superior Court. Fuller now argues that had the District Court judge applied the amended § 72 to his circumstances, these concerns might have been allayed since, if convicted of delinquency by reason of murder in the first degree, Fuller would not have been released for at least fifteen years. We cannot be certain that the prospect of this prolonged period of confinement would have allayed the District Court judge's concerns. The District Court judge did say that "I am not certain that Fuller can be rehabilitated," and he noted that the rehabilitative services and therapy available to juveniles would no longer be available once he was transferred to the custody of the Department of Correction.

The District Court should not have considered Fuller's prospects for rehabilitation in the light of the amendment to § 72, because that amendment does not apply to him. The Legislature provided that the effective date of the amendment is December 31, 1991. See St. 1991, c. 488. Whether this date refers to all proceedings after that date, as Fuller contends, or only to proceedings concerned with acts committed after that date, depends first of all on the intent of the Legislature. See *Commonwealth* v. *Bargeron*, 402 Mass. 589 (1988). The construction Fuller proposes would give the amendment retroactive effect, varying the substantive consequences of acts completed before the effective date.[4] Absent

---

[4]The 1991 amendment to § 72, by establishing a fifteen-year mandatory minimum sentence for first and second degree murder, increased the pun-

clear language to the contrary it is presumed that legislation is not intended to operate retroactively. See *Nantucket Conservation Found., Inc.* v. *Russell Management, Inc.*, 380 Mass. 212, 214 (1980); *Commonwealth* v. *Davis*, 380 Mass. 1, 14-15 (1980). See also *Hassett* v. *Welch*, 303 U.S. 303, 314 (1938). In the present case, that usual presumption is greatly strengthened because there are serious, if not insuperable, constitutional barriers to the alternative interpretation for which Fuller contends. *Commonwealth* v. *Davis*, *supra* at 15. See *School Comm. of Greenfield* v. *Greenfield Educ. Ass'n*, 385 Mass. 70, 79 (1982) (recognizing "our duty to construe statutes so as to avoid . . . constitutional difficulties, if reasonable principles of interpretation permit").

It is an elementary principle of the rule of law, of the United States Constitution, art. I, § 10, and of art. 24 of the Massachusetts Declaration of Rights that ex post facto laws are prohibited. Such laws were early defined as "[e]very law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." *Calder* v. *Bull*, 3 U.S. (3 Dall.) 386, 390 (1798). Accord *Commonwealth* v. *Kelley*, 411 Mass. 212, 214 (1991). Therefore, the two critical components of an ex post facto law are that it operate retrospectively and to the detriment of the defendant. See *Commonwealth* v. *Kelley*, *supra* at 215, citing *Weaver* v. *Graham*, 450 U.S. 24, 35-36 (1981). Thus, if the amendment operates to Fuller's detriment, the ex post facto clauses prevent its application retroactively.

Fuller argues that the application of the amendment at his transfer hearing might have provided a benefit in his case. Fuller points out that the availability of this increased punishment might have persuaded the judge to retain his case in the juvenile system, thus avoiding the still harsher mandatory life sentence. We believe that this argument rests

---

ishment for juveniles convicted of such a crime who remain in the juvenile system and, thus, substantively changed the law. See *Commonwealth* v. *Kelley*, 411 Mass. 212, 214-215 (1991); *News Group Boston, Inc.* v. *Commonwealth*, 409 Mass. 627, 631 (1991). The defendant does not contest this conclusion.

on such a congeries of suppositions and special circumstances that it cannot be allowed to satisfy the strict requirements of the ex post facto clauses. As the Supreme Court has stated, the determination whether a statute retroactively increases the burdens on criminal defendants must be made by an analysis that "looks to the challenged provision, and not to any special circumstances that may mitigate its effect on the particular individual." *Weaver* v. *Graham*, 450 U.S. 24, 33 (1981). Cf. *Commonwealth* v. *Arment*, 412 Mass. 55, 62-63 (1992) (refusing to speculate on the impact of an amendment to G. L. c. 123A in the context of an equal protection analysis).

Prior to the 1991 amendment, juveniles charged with delinquency by reason of murder in the first degree faced the possibility (a) of incarceration until they reached twenty-one years of age or (b) of transfer to the Superior Court to be tried as adults. The amendment subjects those same juveniles to a minimum of fifteen years in prison or transfer to the Superior Court to be tried as adults. Therefore, on its face, the 1991 amendment to § 72, by subjecting a person who previously could be held in custody only until his twenty-first birthday to a minimum term of fifteen years, "inflicts a greater punishment, than the law annexed to the crime, when committed." *Calder* v. *Bull, supra* at 390. For Fuller's argument to prevail, we must be certain that in every case a judge would only retain jurisdiction over a juvenile if the longer sentence of the amended statute would apply, and that in no case would a judge be ready to see the previous, more lenient juvenile sentencing scheme apply. Obviously, there is no basis for such a general supposition. And even if there might be such cases, our construal of the effective date of the amendment cannot vary from case to case depending on such suppositions.

This court faced an argument similar to the one pressed by Fuller and refused to engage in speculation as to the possible impact of an amendment. See *Commonwealth* v. *Davis, supra* at 12-17. In *Davis*, this court, admitting that it was uncertain of the impact of an amendment to G. L. c. 278,

§ 33E, held that as a matter of statutory construction the "influence — if not the command" of the ex post facto provisions required that the amended law apply only prospectively. *Id.* at 16 & n.23, quoting *Byrd* v. *Blue Ridge Rural Elec. Coop., Inc.*, 356 U.S. 525, 537 (1958). See *Commonwealth* v. *A Juvenile (No. 2)*, 384 Mass. 390, 391-392 n.1 (1981). Thus, when Fuller suggests that we speculate as to the impact of an amendment, we not so much refuse as rest on the presumption that the Legislature would not have created a law that may operate to offend the ex post facto clauses of the Constitutions of the Commonwealth and the United States.[5]

For these reasons, we may confidently conclude that the Legislature, in providing for an effective date of December, 1991, intended the amendment to apply only to offenses committed on or after that date.[6]

## B.

Fuller seeks reversal because of the defects he finds in the jury instructions. He neither requested the instructions that he now claims should have been given, nor objected to those of which he now complains. Accordingly, we must determine if there was error, and if so, whether such error created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Pierce*, 419 Mass. 28, 35 (1994). We conclude that

---

[5]The defendant argues that he was denied equal protection of the laws when the transfer judge failed to consider the amendment in connection with his case. See *Commonwealth* v. *Arment*, 412 Mass. 55 (1992). This argument, however, fails at its inception for much the same reason that application of the amendment would violate the ex post facto clause: namely, that on its face the amendment works to the defendant's detriment. Thus, the defendant is not burdened by the transfer judge's refusal to apply the amendment to his case, and, therefore, the defendant cannot make use of the equal protection clause. See *id.* at 60 (requiring defendant to be in the class of persons harmed by amendment).

[6]Fuller's counsel below did not raise this issue either at the transfer hearing or at the trial. Far from characterizing this as ineffective assistance, as Fuller now invites us to do, we do not fault counsel at all for failing to make an argument, which, while novel and ingenious, is without merit.

there was no such error. We comment briefly on the substance of Fuller's contentions.

Fuller contends that the judge should have defined the meaning of the terms "mental disease or defect" that she used in her charge. In the context of the charge as a whole, there was no error. The charge followed the language approved in *Commonwealth* v. *McHoul*, 352 Mass. 544 (1967). The judge charged the jury that the prosecution must prove beyond a reasonable doubt that Fuller did not suffer from a mental disease or defect at the time of the killing or, if he did, that he nevertheless did not lack the substantial capacity to appreciate the wrongfulness of his actions or to conform his conduct to the requirements of the law. Though Fuller is correct that the judge should explain the meaning of technical terms where that meaning is obscure and there is a possibility of confusion, see *Commonwealth* v. *Benders*, 361 Mass. 704, 707-708 (1972), this court has declined to impose any obligation on a trial judge to provide a further explanation of the terms in issue here. Cf. *Commonwealth* v. *Mulica*, 401 Mass. 812, 816-820 (1988) (mental disease and defect instruction focusing the jury on one particular type of mental disease or defect may have limited the jury's consideration of other types of mental disease or defects and improperly reduced the Commonwealth's burden); *Commonwealth* v. *Mills*, 400 Mass. 626, 635 n.3 (1987) (O'Connor, J., dissenting) (suggesting that this court should define "mental disease or defect"). Our unwillingness to impose a mandatory instruction arises not because the term "mental disease or defect" is so clear on its face that such an explanation would be superfluous. The reason may well be the opposite; the subject is so complex and obscure that any general explanatory formula is likely to mislead and confuse. Thus, for guidance to the jury in this area, we rely on the discretion of the judge "so long as all necessary instructions are given in adequate words." *Commonwealth* v. *Torres*, 420 Mass. 479, 484 (1995). The judge here took great pains to instruct the jury to consider all the testimony. Where the defense had presented three sophisticated and articulate experts who dis-

cussed the psychological factors in depth, and the Commonwealth's expert by contrast testified far more briefly and in relatively conclusory terms, we think that the jury had been as enlightened on this score as can reasonably be demanded.

Fuller contends that the judge erred in her instruction on "third prong malice" when she instructed that the jury could find malice by proof of "an unexcused specific intent to do an act creating a plain and strong likelihood that death or grievous bodily harm will follow." Fuller argues that the judge's instructions were incorrect in mentioning grievous bodily harm. We have recently reiterated that the third prong of the malice definition can only be satisfied by proof that "there was a plain and strong likelihood of death." *Commonwealth v. Sires*, 413 Mass 292, 303 n.14 (1992). See *Commonwealth v. Judge*, 420 Mass. 433, 437 (1995). In the appropriate case we might be moved to set aside a verdict based on an erroneous third prong malice instruction, but this is not such a case. The jury specifically found Fuller guilty of murder in the first degree by reason of deliberately premeditated malice aforethought. The evidence supporting their finding of malice under the first prong is overwhelming. Thus, any errors as to the third prong malice instruction are irrelevant. See *Commonwealth v. Judge, supra* at 444 ("'"Where a crime can be committed in any one of several ways . . . [t]hen the defendant should be convicted if it is proved that he committed the crime in any of those ways." *Commonwealth v. Chipman*, 418 Mass. 262, 270 n.5 (1994), quoting *Commonwealth v. Dowe*, 315 Mass. 217, 219-220 (1943).' *Commonwealth v. Nichypor, supra* at 212").[7]

---

[7]The judge instructed the jury that they might consider any mental impairment caused by the consumption of alcohol or drugs in determining whether Fuller had the requisite specific intent under the third prong of malice. Fuller argues that the trial judge erred by failing to give a further instruction about the effect of such consumption on his awareness of the circumstances or his intention to commit the acts that carried a high risk of death. Because we find sufficient evidence on which the jury could find malice under the first prong, we do not reach this argument.

Given the plethora of confirming evidence, the defense's own contentions that Fuller's anger was brooding, smoldering, and longstanding, and the focus of the case on Fuller's lack of responsibility by reason of dysthymia, the failure to instruct on voluntary manslaughter because of a killing in a sudden rage or on provocation was not error. See *Commonwealth* v. *McGuirk*, 376 Mass. 338, 345-346 (1978); *Commonwealth* v. *Benjamin*, 369 Mass. 770, 773-774 (1976). See generally *Commonwealth* v. *Pierce*, 419 Mass. 28, 31-32 (1994).

Fuller also contends that the judge erred by failing to caution the jury in their evaluation of the credibility of the two immunized witnesses. On direct examination, the jury were made aware that these witness had been granted immunity. The judge instructed the jury that in assessing credibility they should consider "the witnesses' motive for testifying and the interest or lack of interest the witness may have in the outcome of the case" and "any bias he . . . has shown in his or her testimony." The plea agreements were not offered in evidence, and there was no mention at trial that truthful testimony was a condition of immunity. Where it is unlikely that the jury were misled into accepting the veracity of the witnesses solely because of their immunization, we have not required special instructions concerning the credibility of immunized witnesses. Cf. *Commonwealth* v. *Colon*, 408 Mass. 419, 445 (1990) (no special instructions necessary where plea agreement does not condition immunization on truthfulness); *Commonwealth* v. *Ciampa*, 406 Mass. 257, 263-264 (1989) (requiring special instructions where the admission of the plea agreement "promis[ing] a sentencing recommendation in exchange for truthful testimony" may have misled the jury to believing that the government knew or was warranting that the witness was telling the truth). See also *Commonwealth* v. *Dise*, 31 Mass. App. Ct. 701, 706 (1991); *Commonwealth* v. *Gagliardi*, 29 Mass. App. Ct. 225, 242 (1990).

Finally, Fuller claims that the judge erred in excluding hearsay declarations by him that he did indeed abuse steroids. He argues that this evidence should have been admitted

under the curative hearsay exception to the hearsay rule. See generally P.J. Liacos, Massachusetts Evidence § 3.13, at 105-109 (6th ed. 1994). It is not at all clear that this exception even applies here, since the assertedly inadmissible testimony which the hearsay was supposed to cure had been elicited by Fuller's own counsel. But in any event, in the context of the trial as a whole, it was not prejudicial error, if error at all, since there can have been very little doubt that the jury were aware that Fuller had abused steroids for some time.

As she is bound to do, Fuller's counsel in her very able brief and argument to this court urges us in the interest of justice to exercise our power under G. L. c. 278, § 33E, either to order a new trial or to reduce the verdict to murder in the second degree. We decline to do so, and add only the following comment. The imposition of a life sentence without possibility of parole is a solemn and awesome act. Like a sentence of death, it is intended to remove a person from our midst for the rest of his natural life. It is more awesome when imposed on one as young as Fuller, who may expect to live out his young manhood, middle, and late years all in confinement. Accordingly, we fulfil the role assigned to this court with the utmost gravity. The Legislature has determined that this grievous penalty is appropriate where a life has been taken in a manner constituting first degree murder, and it has also determined that even one who was as young as Fuller may be subject to this severest of punishments. Our role is to determine whether there are circumstances in the particular case that urge a mitigation of the punishment the Legislature has decreed. There are none here, unless we were to rule that youth itself is a mitigation or indeed that no one should be put by a court beyond the possibility of eventual release. That we are not free to do.

*Judgment affirmed.*
*Order of the single justice*
*affirmed.*