COMMONWEALTH *vs.* EDEN JUDY ASMERON.

No. 06-P-886.

Middlesex. September 12, 2007. - November 7, 2007.

Present: CYPHER, KANTROWITZ, & COHEN, JJ.

*Deriving Support from Child Prostitution. Evidence,* Immunized witness, Corroborative evidence. *Witness,* Immunity, Corroboration. *Practice, Criminal,* Instructions to jury.

At the trial of an indictment charging the defendant with deriving support from the proceeds of prostitution committed by a minor, at which the minor testified under a grant of immunity, sufficient independent evidence existed to corroborate the minor's testimony that she was engaged in prostitution, that she was a minor, that the defendant knew she was a prostitute, and that the defendant derived support or shared in the monetary proceeds of prostitution, knowing that such proceeds were from the prostitution of the minor [671-674]; further, the judge did not err in failing to give a requested instruction that the jury could not convict solely on the testimony of the witness who had been granted immunity, where no special instruction was required, as the jury were never informed that the witness's immunity for past crimes was contingent on her truthful testimony, and where the judge's charge as a whole adequately covered the issue [674-675].

INDICTMENT found and returned in the Superior Court Department on May 2, 2002.

The case was tried before *Charles T. Spurlock,* J., and a motion to set aside the verdict or for a new trial was considered by him.

*Robert A. O'Meara* for the defendant.

*Loretta M. Lillios,* Assistant District Attorney, for the Commonwealth.

CYPHER, J. The defendant, Eden Judy Asmeron, was convicted by a Superior Court jury in February, 2005, of deriving support from the proceeds of prostitution committed by a minor, G. L.

c. 272, § 4B.[1] Subsequently, acting on the defendant's posttrial motion under Mass.R.Crim.P. 25(b)(2), 378 Mass. 896 (1979), the trial judge denied her motion to set aside the verdict and enter a finding of not guilty or, in the alternative, order a new trial. The defendant appeals, challenging the sufficiency of the evidence corroborating the immunized witness's testimony and the judge's refusal to instruct the jury that they could not convict solely on the testimony of the immunized witness.

*Factual background.* While Belmont police Officer Michael Logan was on patrol in the area of 43 Burnham Street on December 4, 2001, at about 2:00 A.M., his attention was drawn to a Boston taxicab idling in front of an apartment building at that address. He had a brief conversation with the driver of the taxicab, and then moved his cruiser a little distance away to observe the scene. He saw a very young woman leave the building and enter the taxicab. She was wearing a coat, very tight jeans, and stiletto heels. As the taxicab drove away, Officer Logan followed it. He soon observed the commission of a motor vehicle infraction and stopped the taxicab. Approaching the driver, he saw that the meter was not running and that the young woman was sitting in the front passenger seat not wearing a seat belt. On inquiry, she identified herself to Officer Logan as Jennifer Poupart. In checking the identities of the driver and the young woman in a computer database maintained by the Commonwealth and the United States, he determined there was no information on the name given by the young woman. She agreed to talk to the officer, however, and the two, along with Belmont police Officer Kristine Kennedy, had a twenty- to thirty-minute conversation at the rear of the taxicab. During that time, she gave the officers an identification card with her picture and a different name, three keys, two hotel room keys, and a notebook. Toward the end of the conversation, the young woman's cellular telephone rang; Officer Logan instructed her to answer it, and she briefly spoke with the defendant. The young woman

---

[1]The defendant was also charged with inducing a minor to become a prostitute, G. L. c. 272, § 4A. At the close of evidence, the trial judge allowed the defendant's motion for a required finding of not guilty as to the § 4A charge, essentially on the ground that one cannot induce a minor who already is a prostitute to become a prostitute. The judge denied the defendant's motion as to the § 4B charge.

agreed to go the police station, where she talked to the police for about forty-five minutes.

Unknown to the police at that time, Jennifer Poupart was a false name, and the young woman was under eighteen years old and a runaway who had been in the custody of the Department of Social Services (DSS). Scared and wanting to get away from the police, she also gave the police a false address and telephone number. She eventually was released to a man she identified at trial as her "godfather," and they then traveled to Alabama and Georgia. While in Georgia, she spoke with her attorney and requested that DSS be contacted so that she could return to Massachusetts. Escorted by a DSS case worker, she flew back to Boston on December 17, 2001.

After her true identity was determined, Darcy's[2] refusal to testify to a Superior Court grand jury was overcome in April, 2002, when she received a grant of immunity.[3]

*The trial.* The Commonwealth's case principally was presented through Darcy's testimony. The jury heard the following. Growing up in Boston, Darcy had been in the custody of DSS from the age of six. On her sixteenth birthday, June 15, 2001, she ran away from her foster home, and ended up working as a prostitute for a pimp in Boston's "combat zone." Dissatisfied with what she was doing, she asked to return to the custody of DSS, but after being placed in her former foster home, she ran away a day later. Finding a recently made friend, Maritsa Vasquez, also known as Maritsa Gonzalves, who ran an escort and prostitution service called "International Tropical Girls" in the Dorchester section of Boston, Darcy "worked" for her for a short time.

Darcy soon was introduced by Vasquez to the defendant and two others at apartment B-3 at 43 Burnham Street in Belmont. Vasquez explained to them that Darcy was a runaway from DSS, was sixteen years old, and needed a place to stay. It was arranged that Darcy would "work" in the escort and prostitution services run from apartment B-3 at 43 Burnham Street on nights and weekends and that she could sleep there. The defendant and Vasquez instructed her never to reveal her true name, age,

---

[2]A pseudonym.

[3]Without the immunity, Darcy might have been subject to delinquency proceedings.

or Social Security number to anyone, in order to avoid being returned to DSS custody. Vasquez also provided her with a false identification card.

Darcy described her work as a prostitute. She worked for two "escort services" operating from the apartment: "Utopia," run by the defendant and Keith Scher; and "Latin Princesses," run by Jonathan Ace.[4] The services were promoted through newspaper advertisements and distribution of business cards. Telephone calls to different numbers for the escort services were answered at apartment B-3, and the caller would ask for either a strip tease or massage. The caller would provide a name and telephone number and state a preference for the "type of girl." One of the women, sometimes Darcy, would call back, confirm her physical attributes, and arrange a time and place to meet. The escort services rented area hotel and motel rooms that the women could use, if needed. In addition, the escort services made drivers available to transport the women and to protect them if "something went wrong."

Darcy was instructed to first collect a $100 fee for one-half hour and $200 for one hour when meeting a "client," before performing a strip tease or massage. After that, "extras" such as oral and vaginal sex could be discussed. Both Vasquez and the defendant instructed Darcy on performing "extras." The defendant and Scher instructed Darcy that the fees would be eighty-five dollars for the former and $185 for the latter. Darcy would call the escort service at the conclusion.

When Darcy first began working for the escort services, she went on calls with the defendant, who instructed her on how to perform "extras" and the need to obtain the fees before performing such "extras." The defendant stopped going on calls in about November, 2001, to operate the telephones for the escort services. The defendant and Vasquez instructed Darcy to keep

---

[4] While Jonathan Ace and Keith Scher are mentioned in this decision and were tried with the defendant, their cases have been disposed of, and nothing in this decision concerns those dispositions.

As to the charges of deriving support from the proceeds of prostitution committed by a minor, the jury found Ace not guilty and Scher guilty. The jury also found Scher guilty of possession of cocaine. Scher appealed to this court and his convictions were affirmed. See *Commonwealth* v. *Scher*, 69 Mass. App. Ct. 1107 (2007).

names and telephone numbers of clients in a notebook. Darcy made various notations in her notebook that served to remind her of a client in case the client called a second time.

Darcy further testified that her financial arrangement with the escort services was to give one-half of her fees to the owner of the service, as well as twenty-five dollars to the driver, and to keep the rest. She gave the money either to Scher or, if he was not there, to the defendant. Darcy paid for her own clothing, food, and the prepaid telephone cards she used to communicate with the escort services.

*Discussion.* 1. *Corroboration of testimony of immunized witness.* The defendant invokes G. L. c. 233, § 20I,[5] to claim that there was no evidence of the commission of the crime with which she was charged, apart from Darcy's testimony. While Darcy's testimony provides a comprehensive and coherent narrative of her participation in the prostitution enterprise, there was other evidence introduced by the Commonwealth, which we examine both for its sufficiency under *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979), and for its value as corroboration of Darcy's testimony.

"The purpose of [G. L. c. 233, § 20I,] is to require support for the credibility of the immunized witness. That support may come as much in the form of corroboration of evidence of the commission of the crime as it does from proof that the defendant was a participant." *Commonwealth* v. *DeBrosky*, 363 Mass. 718, 730 (1973). It is "require[d] that there be some evidence in support of the testimony of an immunized witness on at least one element of proof essential to convict the defendant." *Ibid.* "The policy basis of evaluating credibility remains the most important factor behind [G. L. c. 233, § 20I]. Cases from other States support this view." *Commonwealth* v. *Fernandes*, 425 Mass. 357, 359 (1997) (footnote omitted). " '[E]vidence corroborating accomplice testimony "need not prove the commission of the crime" '; all that is necessary is that the evidence 'satisfies the jury that the accomplice is telling the truth.' " *Id.*

[5]General Laws c. 233, § 20I, inserted by St. 1970, c. 408, provides: "No defendant in any criminal proceeding shall be convicted solely on the testimony of, or the evidence produced by, a person granted immunity under the provisions of section twenty E."

at 359-360, quoting from *People* v. *Cunningham*, 48 N.Y.2d 938, 940 (1979).

The charged crime under G. L. c. 272, § 4B,[6] requires the Commonwealth to prove beyond a reasonable doubt that (1) Darcy was engaged in prostitution (2) as a minor[7]; (3) the defendant knew Darcy was a prostitute; and (4) the defendant derived support or shared in the monetary proceeds of prostitution, knowing that such proceeds were from the prostitution of Darcy. The judge so instructed the jury. Those instructions are not contested in this appeal.[8]

The Commonwealth elicited the following evidence which supports the corroboration requirements.[9]

a. Officer Logan's observations of Darcy entering a Boston taxicab in Belmont at an early morning hour, and the hotel keys, notebook, and false identification card she gave him, support her testimony describing how she set out on a "call." It is significant that this evidence was given voluntarily by Darcy to the police before she was granted immunity.[10]

b. Most of the defendant's argument is focused on an assertion that there was inadequate corroboration of Darcy's age. There was ample evidence that she was a minor. Darcy was competent to testify to her age, stating that her birthday was

---

[6]General Laws c. 272, § 4B, inserted by St. 1979, c. 676, provides in relevant part: "Whoever lives or derives support . . . from the earnings or proceeds of prostitution committed by a minor, knowing the same to be earnings or proceeds of prostitution, or shares in such earnings, proceeds or monies, shall be punished . . . ."

[7]The prosecution was not required to offer evidence that the defendant knew or should have known Darcy's age in order to secure a conviction under G. L. c. 272, § 4B. *Commonwealth* v. *Baker*, 17 Mass. App. Ct. 40, 43 (1983). However, there was some evidence regarding the defendant's knowledge. Darcy testified that Ace once asked her age in the presence of the defendant, and when she replied eighteen or nineteen, he asked her to tell the truth. Because Darcy had been instructed not to reveal personal information, she hesitated, but when the defendant indicated it was all right to tell Ace the truth, Darcy told him she was sixteen. Ace replied, "I should have never asked."

[8]The judge also gave an instruction on joint venture.

[9]On appeal, the defendant does not argue that any trial testimony or exhibit evidence should have been excluded.

[10]At trial, Darcy testified that without revealing her true identity, she told the police she was a prostitute and gave them the names of three persons involved in prostitution operations at 43 Burnham Street.

June 15, 1985, and that she was sixteen on December 4, 2001. See *Commonwealth* v. *Phillips*, 162 Mass. 504, 505 (1895) ("Such testimony has been repeatedly held competent"). Aside from the testimony of Darcy's case manager, Maria Gomes-Cruz, that DSS custody of a child ends at age eighteen, Gomes-Cruz testified, unchallenged, that she met Darcy when Darcy was eleven years old, that she had been Darcy's case manager since 1996, and that Darcy was in DSS custody on December 17, 2001.

c. In addition to other evidence of the defendant's direct involvement in Darcy's activities, the defendant interrupted Darcy's conversation with Officers Logan and Kennedy after the taxi had been stopped, by making a call to Darcy's cellular telephone. It is a reasonable inference that the defendant was monitoring Darcy's whereabouts after she left 43 Burnham Street.

d. The defendant did not testify at trial. Belmont police Sergeant Richard Santangelo, however, testified that in an unrecorded, Mirandized statement made to the police, the defendant stated that Utopia was her business and she received $100 for setting up assignments of girls at bachelor parties, but if they arranged to receive cash for sex, they did so on their own, and she knew nothing about it. On appeal, the defendant asserts that the evidence minimally may have been sufficient to show that an escort service was being operated at 43 Burnham Street, but such a service is legal.

There were several exhibits, however, from which the jury reasonably could infer that the escort services were organized for the recruitment and assignment of prostitutes.[11] An electronic mail message written by the owner of Utopia to a number of addressees at "adultfriendfinder.com" outlined a plan for a "traveling family of women" to attract men to a party at a hotel, stating that "all of the men are tricks."[12] That term is used in another exhibit titled "Daily Routine," apparently a

[11]Search warrants were executed for apartment B-3 at 43 Burnham Street, for a basement storage area assigned to the apartment, and for forensic analysis of electronic files in computer equipment found in those premises.

[12]Customers of a prostitute are referred to as "tricks." See *Commonwealth* v. *Thetonia*, 27 Mass. App. Ct. 783, 786 (1989).

schedule for the women to be involved in a plan to find "tricks" at clubs, lounges, and bars, and take them to a hotel. Two pages of handwritten notes contain what appear to be questions for interviews, including "How far will go 4 $." There are several references to "ho," the street slang for prostitute. What appears to be a copy of a Web site page, ostensibly recruiting women for escort services, also states, "looking for weomin [*sic*] for great sex," and that the "ideal person" includes a "sexy female who is adventurous[,] . . . driven by money, and know[s] how to seduce and hustle men."

Finally, the defendant asserts that because so little cash was found in apartment B-3 at 43 Burnham Street, that small amount of money corroborates nothing with respect to any amount of proceeds shared from prostitution. In this case, there was evidence that newspaper advertisements and the rent of the apartment were paid in cash. In any event, G. L. c. 272, § 4B, is silent on any requirement for proof of the number of times that "earnings," "proceeds," or "monies" are shared or their amounts.

We conclude that the evidence amply corroborated Darcy's testimony. We also conclude that the evidence, viewed according to *Commonwealth* v. *Latimore*, 378 Mass. at 677-678, was adequate on each element of the charged crime. All questions of the weight of the evidence and the credibility of the testimony were for the jury to decide. See *Commonwealth* v. *Ruci*, 409 Mass. 94, 97 (1991); *Commonwealth* v. *Jones*, 432 Mass. 623, 625 (2000).

2. *Claimed error in failure to give specific instruction on corroboration.* The defendant claims that the judge failed to give a requested instruction that the jury "can't convict solely on the testimony [of an immunized witness]." The defendant asserts that the corroboration was "slim at best," and that if the jury did not believe the corroborating evidence, they convicted her solely on the testimony of the immunized witness.

In addressing this issue as raised in the defendant's posttrial motion, the judge stated in his memorandum of decision and order that the "jury were never informed that [Darcy's] immunity for past crimes was contingent on her truthful testimony." Accordingly, he also stated that "[s]pecial instructions concerning the credibility of an immunized witness are not required

where the details of the immunity agreement are not entered in[] evidence and the requirement of truthful testimony as a condition of immunity is not highlighted." "Where it is unlikely that the jury were misled into accepting the veracity of the witnesses solely because of their immunization, we have not required special instructions concerning the credibility of immunized witnesses." *Commonwealth* v. *Fuller*, 421 Mass. 400, 413 (1995).

The instruction given by the judge was as follows:

> "In this case you heard the testimony of [Darcy,] who testified under an agreement with the prosecution that in exchange for her truthful testimony the prosecution would grant her immunity from any crimes that she has committed.

> "You should examine that witness's credibility with particular care. You may consider that agreement in any hopes the witness may have as to future advantages from the prosecution in evaluating that witness's credibility along with all other factors I have already mentioned regarding credibility. You should also consider the fact that the Commonwealth does not know whether the witness is telling the truth."

This instruction conforms substantially with the Superior Court model jury instruction for immunized witnesses. See Massachusetts Superior Court Criminal Practice Jury Instruction § 4.21 (Mass. Continuing Legal Educ. Supp. 2003).

"We have ruled that '[t]he judge is not required to grant a particular instruction so long as the charge, as a whole, adequately covers the issue.' " *Commonwealth* v. *Daye*, 411 Mass. 719, 739 (1992), quoting from *Commonwealth* v. *Anderson*, 396 Mass. 306, 316 (1985). Compare *Commonwealth* v. *Roberts*, 5 Mass. App. Ct. 881, 882 (1977). There was no error.

*Judgment affirmed.*