## Commonwealth *vs.* Alberto Trappaga.

No. 08-P-872.

Essex. April 16, 2009. - April 8, 2010.

Present: Rapoza, C.J., Cypher, Berry, Mills, & Rubin, JJ.

*Sex Offender. Practice, Civil,* Sex offender, Instructions to jury. *Evidence,* Sex offender, Sexual conduct. *Practice, Criminal,* Detainer.

At proceedings arising from a petition for the defendant's commitment under G. L. c. 123A as a sexually dangerous person, there was no error in the jury instructions that would yield a substantial risk of a miscarriage of justice, where the instructions correctly framed the issue whether the defendant was a sexually dangerous person, and where the trial record supported a jury verdict that each element of proof under G. L. c. 123A was met (i.e., that the defendant had committed prior sexual offenses, suffered from a personality disorder, and was therefore likely to reoffend if not confined to a secure facility); further, the judge's omission, in his charge to the jury, of an instruction that the defendant's exhibitionism was not a predicate sexual offense for future dangerousness consideration did not render the instructions inadequate, where the expert evidence was clear that exhibitionism would not trigger a finding of sexual dangerousness under G. L. c. 123A, and where the jurors could not plausibly have been confused by the lack of an instruction on exhibitionism. [540-547] Mills, J., with whom Rubin, J., joined, dissenting.

An individual subject to a detainer order issued by the Federal government may be committed as a sexually dangerous person pursuant to proceedings under G. L. c. 123A. [547]

Petition filed in the Superior Court Department on March 4, 2003.

The case was tried before *David A. Lowy,* J., and a motion for relief from judgment was heard by him.

*Frederic G. Bartmon* for the defendant.

*Catherine Langevin Semel,* Assistant District Attorney, for the Commonwealth.

Berry, J. After his adjudication as a sexually dangerous person, G. L. c. 123A, and commitment to the Massachusetts Treatment

Center at Bridgewater State Hospital for a term of from one day to life, the defendant appeals. He also appeals from the denial of his motion for relief from judgment. The defendant claims (1) that the jury instructions were insufficient; and (2) that the proceedings were improperly brought because a Federal immigration detainer had been lodged against him that would preclude his release into the community. We conclude that the jury instructions, without objection and agreed to by trial counsel, were not in error and did not create a substantial risk of a miscarriage of justice. We also rule that the Federal detainer does not contradict the proceedings.

1. *Procedural background.* The defendant was convicted by plea in September of 1983 on two counts of assault with intent to rape, one count of assault and battery by means of a dangerous weapon, and one count of assault by means of a dangerous weapon. The defendant was committed to State prison and was paroled in 1986. While on parole, he was convicted and sentenced in New York on a property offense. He was returned to Massachusetts in May, 2002, where parole was revoked and he was returned to prison. In April, 1993, Federal authorities lodged a detainer informing of a pending order of deportation against the defendant.

Prior to the defendant's scheduled release from prison, the District Attorney filed a petition for the defendant's commitment under G. L. c. 123A; probable cause was found. The defendant was examined by two qualified examiners pursuant to G. L. c. 123A, § 1, and two experts of his choosing. Expert reports were filed, and a jury trial took place in December, 2003.[1] The jury found the defendant to be a sexually dangerous person and committed him. On March 23, 2006, the defendant filed a motion for relief from judgment arguing that the commitment proceedings were premature and void because the immigration detainer precluded his release to general society. That motion

---

[1]For an overview of G. L. c. 123A, including the commitment process, see *Commonwealth* v. *Bruno,* 432 Mass. 489 (2000). The statute provides, inter alia, that the trial shall be by jury, unless waived, with the assistance of counsel; that the defendant can obtain process to compel the attendance of witnesses; and that the jury's decision must be unanimous and beyond a reasonable doubt. See G. L. c. 123A; *Commonwealth* v. *Nieves,* 446 Mass. 583, 591 (2006).

was denied. He appeals from both the 2003 judgment and the 2006 denial of his motion for relief from judgment.

2. *The jury trial.* Evidence at the trial included testimony from the four experts as well as their written reports. The qualified examiners both opined that the defendant was a sexually dangerous person, while the defendant's two retained experts opined that he was not. The expert testimony focused on several areas: the defendant's underlying criminal sexual offenses; the defendant's sexual conduct during his incarceration; assessment of the defendant's personality disorder; and the defendant's likelihood to reoffend, based on various protocols and actuarial models. The documentary evidence also included the grand jury minutes of the underlying 1983 criminal sexual offenses; detailed police reports describing those incidents and the complaints to the police from the victims; and nineteen disciplinary reports of the defendant's sexually related behavior while incarcerated in Massachusetts.[2]

3. *Jury instructions.* For the reasons that follow, we conclude that there was no error in the jury instructions that would yield a substantial risk of a miscarriage of justice. First, contrary to the arguments advanced on appeal, defense counsel's decision to accept the jury instructions would, in this case, be a reasonable

---

[2]As to documentary evidence, G. L. c. 123A, § 14(c), provides as follows:

> "Juvenile and adult court probation records, psychiatric and psychological records and reports of the person named in the petition, including the report of any qualified examiner, as defined in section 1, and filed under this chapter, police reports relating to such person's prior sexual offenses, incident reports arising out of such person's incarceration or custody, oral or written statements prepared for and to be offered at the trial by the victims of the person who is the subject of the petition and any other evidence tending to show that such person is or is not a sexually dangerous person shall be admissible at the trial if such written information has been provided to opposing counsel reasonably in advance of trial."

We do not suggest that the statute abrogates otherwise applicable rules of evidence and the discretionary authority of the judge in ruling on the admissibility of evidence. We note that, in this case, no documentary evidence was admitted over the defendant's objection. See *McHoul, petitioner,* 445 Mass. 143, 158 (2005), cert. denied, 547 U.S. 1114 (2006) (Spina, J., concurring in part and dissenting in part) (disagreeing with majority's approval of totem pole hearsay, but considering the issue waived because petitioner did not preserve objection at trial).

strategic election. Second, counsel's decision not to have the jury instructions emphasize the issue of exhibitionism by the defendant during his prison incarceration would also be a reasonable strategic election where the exhibitionism was excluded by the experts as a predicate for a finding of future sexual dangerousness under G. L. c. 123A. Third, the trial evidence concerning the defendant's characteristics as a sexually dangerous person was strong and clear.

Against the backdrop of the trial evidence, and applying the elements that the Commonwealth must prove, we determine that under G. L. c. 123A, the issue whether the defendant was a sexually dangerous person was correctly framed in the jury instructions, and that this jury could have reached an informed determination beyond a reasonable doubt that the defendant was a sexually dangerous person under G. L. c. 123A.

We turn to the judge's instructions, and then turn to a review of the trial record, which we conclude supports a jury verdict reflecting that each of the elements of proof under G. L. c. 123A was met. The judge instructed the jury as follows:

> "So, as I have explained, the sole issue that you are called upon to decide in this case is whether the [defendant], as of the present time, is a sexually dangerous person. Our Legislature has defined the sexually dangerous person as any person who has been convicted of a sexual offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in sexual offenses if not confined to a secure facility. Here, the Commonwealth is proceeding only under the theory of personality disorder and not mental abnormality. So to meet its burden of proof in this case, the Commonwealth must prove each of three elements beyond a reasonable doubt: first, that the [defendant] has been convicted of a sexual offense; second, that he suffers from a personality disorder, and third, that as a result of the personality disorder, he is likely to engage in sexual offenses if not confined to a secure facility. Those are the three elements."

On the first element, with respect to the defendant having been convicted of a sexual offense, the jury heard evidence concerning the defendant's convictions on rape and attempted rape indictments. The convictions arose from the defendant's attacks on two

women on one day in 1983. Both victims were strangers to the defendant; he accosted both women and, with force and violence, raped one woman and attempted to rape the other woman.[3]

Beyond these convictions for sexual offenses, there was evidence that the defendant engaged in inappropriate sexual behavior while incarcerated from 1994 to 1999. Prison disciplinary reports were filed against the defendant for five separate incidents. Each incident involved the defendant exposing his penis or masturbating in the presence of a female nurse, prison counselor, or a correction officer. The defendant later described these incidents as "turn[ing him] on" or "arous[ing him]." There were also prison disciplinary reports concerning aggressive behavior by the defendant when he threw feces at a guard, and attacked another inmate with a padlock.

On the second element of personality disorder or mental abnormality, the judge's instructions were explicit, unequivocal, and correct that the Commonwealth was relying on proof that the defendant suffered from a personality disorder. This part of the jury instructions was consistent with all the expert psychiatric and physiological evidence presented. Specifically, from the testimony of all four experts — the two qualified examiners for the Commonwealth and the two defense experts — it was clear that the personality disorder of the defendant at issue was an antisocial personality disorder. Both of the Commonwealth's qualified examiners opined that the defendant met the criteria for antisocial personality disorder. Both defense experts acknowledged that the defendant exhibited the characteristics of antisocial personality disorder, except for the criterion that the defendant manifested this disorder before the age of fifteen. Even accepting the defense experts' reservation because of the missing diagnostic criterion concerning the defendant's behavior before the age of fifteen, all four experts agreed that the defendant suffered from antisocial personality disorder. Thus, the judge's instructions

[3]The defendant abducted the first woman on a public street, brandished a knife, and threatened to kill her. He took the victim to his apartment, where, after tearing off her clothes, he anally raped her. The victim was finally able to escape. One and one-half hours later, the defendant accosted another woman as she walked through a vacant field. He held a razor to her throat. She struggled, and as she did so, the defendant inflicted a one-inch laceration to her throat. The defendant fled.

correctly directed the jury to consider whether the Commonwealth had proved that the defendant had a personality disorder. Given the evidence, we are not persuaded that there was any likelihood that there would be potential jury misunderstanding concerning the legal standard, or jury confusion concerning the evidence as applied to this second element. In sum, we discern no error that would give rise to a substantial risk of a miscarriage of justice arising out of this part of the jury instruction concerning personality disorder.

The third and final element of the jury instructions was "that as a result of the personality disorder, [the defendant] is likely to engage in sexual offenses if not confined to a secure facility." Both of the Commonwealth's qualified examiners concluded that the defendant's antisocial personality disorder, his prior rape and attempted rape convictions, and the pattern of his inappropriate sexual behavior (exhibitionism) while in prison supported the opinion that the defendant would re-offend and commit sexual offenses. The first qualified examiner, Dr. Tomich, based his ultimate opinion that the defendant was sexually dangerous on the fact that the victims were strangers whom the defendant seized from public places and assaulted with force and weapons (knife and razor). Dr. Tomich also based his opinion of future sexual dangerousness on the defendant's proclivity for deviant sexual arousal, as reflected in the defendant's sexual and aggressive conduct during incarceration.[4] The second Commonwealth qualified examiner, Dr. Feldman, also concluded that the defendant was likely to be sexually dangerous in the future. In support of this opinion, Dr. Feldman focused on the fact that the original offenses were perpetrated on anonymous victims, with violence, and with weapons. Dr. Feldman's testimony also considered the defendant's continuing deviant sexual arousal and aggression, and cited the defendant's unwillingness to take responsibility for his criminal acts, his lack of remorse, and his failure to complete sex offender treatment.

[4]At the time of his evaluation for the trial under G. L. c. 123A, the defendant acknowledged to Dr. Tomich that he still continued to think about exposing himself to women or assaulting women sexually, but claimed he would "never do it now." In contrast, the defendant later told the defense expert, Dr. Bard, that he no longer had the urge to expose himself, and had not experienced such urges since 1999.

Both defense experts were of the contrary opinion and concluded that the defendant would not be likely to re-offend and would not be sexually dangerous in the future. Dr. Plaud reasoned that the defendant was at low risk to re-offend based on an actuarial test linked to the defendant's age. Dr. Plaud also considered the lack of offenses committed after the rape convictions. The other defense expert, Dr. Bard, concluded that the defendant was not likely to re-offend based on the application of three actuarial tests, which took into account factors such as the defendant's age and number of convictions.

The jury, however, could determine that the opinions of the qualified experts for the Commonwealth were more compelling and persuasive. This is particularly so in that while both defense experts opined against the prospect of future sexual dangerousness, they acknowledged that the defendant demonstrated many of the elements of an antisocial personality, that his prior sexual offenses manifested violence and aggression, and that his sexually inappropriate behavior continued during his prison term.

In sum, throughout the trial, there was evidence to prove the third element under G. L. c. 123A, that the defendant was likely to continue to engage in sexual offenses if not confined. The third part of the instructions, albeit short, was clear on this element.[5]

The defendant did not request that the judge instruct the jury that the defendant's exhibitionism was not a predicate offense for future dangerousness consideration.[6] Nor did the defendant's counsel subsequently object to the judge's omission of such a spontaneous instruction. This defense stance, as previously noted, would be a justified litigation strategy because any such reference in the legal instructions to the defendant's pattern of exhibitionism might have yielded an overly predominant focus on this issue at this point in the trial — especially since,

---

[5]The dissent suggests that there was error and a substantial risk of a miscarriage of justice because the judge "should have provided an explanation" of sexual offense in the context of G. L. c. 123A. We are not persuaded a substantial risk of a miscarriage of justice was posed because the judge did not, sua sponte, charge that acts of exhibitionism were not to be considered as potential future sexual offenses under G. L. c. 123A.

[6]The judge had provided the attorneys with the text of his proposed instructions on a day prior to the closing. He requested comment prior to delivery; after the instructions were given, both attorneys were content.

adverse to the defense, these incidents were more recent in time (1994-1999), in contrast to the much older (1983) rape-related offenses.

Despite the lack of objection at trial, the defendant nevertheless argues on appeal that the instructions were inadequate because exhibitionism was not a defined predicate sexual offense under G. L. c. 123A, § 1, at the time of the trial.[7] Thus, the defendant argues, the jury may have been confused and considered the five incidents of exhibitionism, when he exposed himself and masturbated, as potential sexual offenses that he would be likely to continue to engage in — conduct not then covered by G. L. c. 123A. The record does not support that proposition. To the contrary, the expert evidence was clear that exhibitionism would not trigger a finding of sexual dangerousness under G. L. c. 123A.[8] Given the testimony and reports of the experts, the jurors could not plausibly have been confused

---

[7]The version of G. L. c. 123A in effect at the time of the defendant's sexually dangerous person trial defined "sexual offense" as including one of ten enumerated crimes: various forms of rape, indecent assault and battery, assault with intent to rape, and unnatural and lascivious acts with a child. In 2004, the statute was amended to include in the definition of sexual offense the crimes of "accosting or annoying persons of the opposite sex and lewd, wanton and lascivious speech or behavior," either of which could encompass the defendant's prison behavior. See St. 2004, c. 66, §§ 1-6.

The definition of "sexually dangerous person" did not change. Thus, for purposes of this case, G. L. c. 123A, § 1, amended by St. 1999, c. 74, defines a "sexually dangerous person" as

"any person who has been (i) convicted of . . . a sexual offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in sexual offenses if not confined to a secure facility."

[8]Three of the four testifying experts stated explicitly — in testimony or in their reports — that exhibitionism would not support a finding of future sexual dangerousness. One qualified examiner, Dr. Tomich, noted that the defendant's five sexual disciplinary prison reports were indicative of exhibitionism. Dr. Tomich specified in his report, however, that "[e]xhibitionism in and of itself is not grounds for his commitment as a Sexually Dangerous Person." The second qualified examiner, Dr. Feldman, testified that exhibitionism would not, by itself, indicate sexual dangerousness. Rather, Dr. Feldman cited the defendant's exhibitionism only as indicative of the defendant's inability to control his sexual impulses even when in the highly restricted setting of a prison.

A defense expert, Dr. Bard, also emphasized that the defendant's exhibitionist

by the lack of an instruction on exhibitionism. Furthermore, during the direct testimony of the first qualified examiner, the trial judge convened a side bar conference and instructed counsel that the prison reports should be referred to as "incidents" or some equivalent term, rather than as "offenses."

Finally, we note, contrary to the suggestion in the dissent, that the defendant does *not* focus his appellate challenge on a claim that a more thorough definition of sexual offense should have been given. The defendant did not request that the instructions include a list of the specific crimes enumerated in the statutory definition of sexual offense. G. L. c. 123A, § 1. Thus, we do not see how the failure to provide additional explanations in the jury charge gave rise to error and a resulting substantial risk of a miscarriage of justice. In a case such as this, a jury does not need, and absent a specific instruction request with supporting reasons therefore, would generally not be given, a complete list of the sexual offenses set forth in G. L. c. 123A, § 1. Certainly the jury may apply their own common sense as to what is a sexual offense, particularly when the entire trial evidence was so directed — with exhibitionism being specifically *excluded* in the expert evidence testimony. See note 8, *supra.* Cf. *Commonwealth* v. *Hosman,* 257 Mass. 379, 385-386 (1926); *Commonwealth* v. *Muckle,* 59 Mass. App. Ct. 631, 643 (2003).

For the foregoing reasons, we do not discern error in the jury instructions such as would give rise to a substantial risk of a miscarriage of justice, and warrant reversal. " 'A trial judge has wide latitude in framing the language to be used in jury instructions' as long as the instructions adequately explain the applicable law." *Kelly* v. *Foxboro Realty Assocs., LLC,* 454 Mass. 306, 316 (2009), quoting from *Jacobs* v. *Pine Manor College,* 399 Mass. 411, 414 (1987). "The test of the charge is the impression created

---

incidents would not render a person sexually dangerous within the meaning of the statute, then added, "I don't even think exposing one's self is an enumerated offense for which you can be subject to this kind of hearing." He also told the jury, "I don't think there's any relationship to an individual exposing himself in prison to someone's risk of reoffending sexually by attempting to rape the women in the community." The other defense expert, Dr. Plaud, discounted the importance of the prison incidents because, in his view, the exhibitionist incidents occurred in an "artificial environment," one where the defendant had no sexual outlet.

by it as a whole." *Commonwealth* v. *Kelley*, 359 Mass. 77, 92 (1971). In this case, based on the instructions, the jury would have been informed that they were to determine whether the Commonwealth had proved beyond a reasonable doubt the three elements under G. L. c. 123A, that is, prior sexual offenses had been committed by the defendant; the defendant suffered from a personality disorder; and the defendant was likely to commit sexual offenses in the future.

4. *Federal detainer.* We reject the defendant's argument that because he is subject to a detainer order issued by the Federal government, he cannot be committed pursuant to G. L. c. 123A proceedings. The decision to execute a deportation order rests entirely with the Federal authorities, who have the discretion to "abandon the endeavor" at any time, whether "for humanitarian reasons or simply for . . . convenience." *Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483-484 (1999). Thus, there is no guarantee that the lodging of a Federal detainer will accomplish the Legislature's purpose under c. 123A: to prevent the release of "persons currently incarcerated for sexual offenses who are about to be released into the community but who, because they are sexually dangerous, are likely to commit another sexual offense." *Commonwealth* v. *McLeod*, 437 Mass. 286, 291 (2002). See *Commonwealth* v. *Ferreira*, 67 Mass. App. Ct. 109, 113 (2006). Nor is there any support for the defendant's suggestion that the deportation order and Federal detainer preempt State action under c. 123A. The defendant, until actually deported, remains subject to the laws of the Commonwealth, see *Plyler* v. *Doe*, 457 U.S. 202, 215 (1982), and no procedure has been initiated by the Federal authorities to intervene in the c. 123A proceedings.

*Judgment affirmed.*

*Order denying motion for relief from judgment affirmed.*

MILLS, J. (dissenting, with whom Rubin, J., joins). I respectfully dissent because I conclude that the jury instructions were inadequate and created a substantial risk of a miscarriage of justice. I would remand for a new trial.

The commitment of a defendant to confinement, possibly for the rest of his life, is a most serious deprivation of liberty. The Legislature has therefore instructed that determination of sexual dangerousness, and need for secure confinement, requires a unanimous jury verdict and proof beyond a reasonable doubt. G. L. c. 123A, § 14(*d*). There is no dispute that jury instructions were required, and some instruction was given.[1] However, the jury were not instructed on an essential element of the Commonwealth's proof, namely, that they were required to unanimously find, by proof beyond a reasonable doubt, that the defendant was "likely to engage in *sexual offenses* if not confined to a secure facility" (emphasis added). G. L. c. 123A, § 1. "Sexual offenses" is a defined term covering only certain conduct. Here, determining which of the behaviors that the defendant was likely to engage in might constitute "sexual offenses" was left to the uninstructed imaginations of a jury of lay persons.

This case is directly controlled by the reasoning in *Commonwealth* v. *Walter*, 40 Mass. App. Ct. 907 (1996). There we considered jury instructions that failed to define the word "felony," which "is an essential element of the crime proscribed by G. L. c. 266, § 18, breaking and entering in the daytime with intent to commit a felony." *Id.* at 909. In that case it was critically important that the jury understand the meaning of "felony," and the types of crimes covered by that category. *Ibid.* "Because the jury was not informed of the meaning of felony, '[t]he defendant's fate thus turned on a *layman's definition* of [felony]. [This is a] technical matter[] with which laymen cannot be expected to be familiar.' *Commonwealth* v. *White*, 353 Mass. 409, 425 (1967), cert. denied, 391 U.S. 968 (1968). See *Commonwealth* v. *Benders*, 361 Mass. 704, 708 (1972); *Commonwealth* v. *Claudio*, 418 Mass. 103, 117-119 (1994) (judge's failure to define 'felony' in combination with other

---

[1]The judge instructed, in relevant part: "Our Legislature has defined the sexually dangerous person as any person who has been convicted of a sexual offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in sexual offenses if not confined to a secure facility. . . . [T]he Commonwealth must prove each of three elements beyond a reasonable doubt: first, that the defendant has been convicted of a sexual offense; second, that he suffers from a personality disorder, and third, that as a result of the personality disorder, he is likely to engage in sexual offenses if not confined to a secure facility."

errors required reversal); *Commonwealth* v. *Fuller*, 421 Mass. 400, 411 (1995) (judge should explain meaning of technical terms where meaning is obscure and there is a possibility of confusion)." *Ibid.* (Emphasis added).

What an average lay juror may consider to be a sexual offense is a matter of considerable speculation, and varies from person to person depending on both subconscious and conscious influences, such as family, religion, education, culture, and other life background and experiences. The Legislature, however, has catalogued which specific sexual offenses constitute a sexual offense within the meaning of the statute. G. L. c. 123A, § 1. The Legislature did not include reference to all criminal sexual behavior and clearly intended that the jurors not self-define the term "sexual offense" for purposes of sexually dangerous person (SDP) proceedings.

In this case, the defendant, on five instances during a period of six years while he was in State prison, engaged in exhibitionism either by way of exposing himself or masturbating in the presence of one or more (usually female) individuals. Such conduct may be unlawful under G. L. c. 272, § 16,[2] but violation of that statute was not a "sexual offense" within the statutory definition in effect at the time of these proceedings. G. L. c. 123A, § 1, as amended through St. 2002, c. 492.[3] There was other evidence of unlawful sexual behavior by the defendant, consisting only of descriptions of the defendant's initial rape and attempted rape in 1983 and the accompanying police reports. But the Commonwealth's experts failed to specify which of the sexual offenses that the Legislature defined in the statute they believed the defendant would commit in the future.

"A judge should instruct the jury fairly, clearly, adequately, and correctly concerning principles that ought to guide and control their action," *Mahoney* v. *Gooch*, 246 Mass. 567, 571 (1923); see *Commonwealth* v. *Batchelder*, 407 Mass. 752, 759 (1990), and is required to set out the elements of the offense in the charge. See *Commonwealth* v. *Reilly*, 5 Mass. App. Ct. 435, 438 (1977). This is an absolute duty that must be performed

[2]General Laws c. 272, § 16, as amended by St. 1987, c. 43, makes unlawful "open and gross lewdness and lascivious behavior."

[3]The current version of G. L. c. 123A, § 1, was amended by St. 2004, c. 66, §§ 1-6, and St. 2008, c. 451, § 84.

irrespective of whether such instructions are requested by either party. See *Mahoney* v. *Gooch, supra* at 571; *Commonwealth* v. *Martin,* 19 Mass. App. Ct. 117, 120 (1984) ("[e]ven apart from the requested instruction, the judge had the duty to state the applicable law to the jury"). Any instructions must be based on the evidence as presented at trial. See, e.g., *Commonwealth* v. *Leftwich,* 430 Mass. 865, 868 (2000) (in order to warrant submitting theory of joint venture to jury, there must be evidence sufficient to permit finding of elements of joint venture beyond a reasonable doubt).

Here, the judge identified the three principal elements of a c. 123A finding, but did not, and was not requested to, explain the words "sexual offense." While it is axiomatic that words that retain their everyday common meaning usually need not be defined, "a judge should explain the meaning of technical terms where their meaning is obscure and there is a possibility of confusion." *Commonwealth* v. *Allen,* 54 Mass. App. Ct. 719, 724 (2002).[4]

In the SDP commitment process, the words "sexual offense" do not have an everyday common meaning but, rather, have been specifically defined by the Legislature. G. L. c. 123A, § 1. The judge should have provided an explanation. See *Commonwealth* v. *Walter,* 40 Mass. App. Ct. at 909; *Commonwealth* v. *Allen, supra* at 724 (requiring explanation of the term "telecommunication services"). The failure to do so "required the jury to speculate in reaching its decision." *Commonwealth* v. *Niziolek,* 380 Mass. 513, 527 (1980). See *Commonwealth* v. *Kessler,* 442 Mass. 770, 777 (2004) (requiring definition of "recklessly" where "there is the possibility that the jury would not realize that recklessness requires more than mere negligence"). Compare *Commonwealth* v. *Fuller,* 421 Mass. 400, 411-412 (1995) (no error in failing to define "mental disease or defect" in instruction on criminal responsibility, where instruction followed language approved by Supreme Judicial Court, and where defense experts "discussed the psychological factors in depth").

---

[4]The court contends that the jury should be permitted to apply their own common sense as to the definition of a "sexual offense" within the meaning of the statute. I disagree. While respectful of the role that common sense can play in our system of justice, I conclude that the possible meanings of "sexual offense," like the possible meanings of "felony," both technical terms defined by statute, cannot be left to the jury's uninstructed imaginations.

I next must consider whether the error created a substantial risk of a miscarriage of justice.[5] In so doing, "[w]e consider the strength of the Commonwealth's case, the nature of the error, the significance of the error in the context of the trial, and the possibility that the absence of an objection was the result of a reasonable tactical decision." *Commonwealth* v. *Azar*, 435 Mass. 675, 687 (2002). Because there was an enormous amount of evidence in this case of the defendant repeatedly engaging in unlawful (and repulsive) sexual behavior while in prison that, despite its criminality, did not amount to a "sexual offense" within the meaning of the statute during the relevant time, the failure to define those words was significant. See *Commonwealth* v. *Acevedo*, 446 Mass. 435, 450 (2006). Further, the evidence with respect to the likelihood to commit a defined "sexual offense" was not "strong and one-sided," *Commonwealth* v. *Miranda*, 22 Mass. App. Ct. 10, 21 (1986), because the parties presented competing, sophisticated expert testimony. The failure to explain the words "sexual offense" required the jury to speculate as to their meaning, and presents the serious risk that the jury either misunderstood the legal meaning of the words or disregarded them entirely. Although counsel may have chosen not to request a definition for strategic reasons, "there is no reasonable tactical basis for a failure to object to a mistaken and unfavorable (to the defendant) definition of an element of the crime." *Commonwealth* v. *Azar*, *supra* at 689.[6]

In a case such as this, where the jury were not instructed completely on the elements of the Commonwealth's required proof, "there is a substantial risk that a person has been convicted

---

[5]I agree with the majority that the substantial risk analysis is appropriate in this case.

[6]I have considered the possibility that the defendant's trial counsel chose not to seek an instruction defining "sexual offense" as a deliberate litigation tactic. It would certainly have been a legitimate goal of the attorney to avoid having the judge read the litany of offenses in the Legislature's definition. My reading of the record leads me to conclude that this issue was ignored by both the attorneys and the judge, and that strategic evaluation by the attorney played no role in the inattention. Furthermore, I would be hard-pressed to accept the result here, where the attorney made no effort to ask the judge to design a definitional instruction based upon the Commonwealth's evidence and where the judge bears the responsibility, as previously noted, to design an instruction limited to the legitimate issues in the case and based upon the evidence presented.

for a course of conduct that [does not make him a sexually dangerous person]." *Commonwealth* v. *Amirault*, 424 Mass. 618, 647 n.21 (1997). This risk was exacerbated by the testimony at trial. Although three of the four experts offered their opinions that exhibitionism alone could not support a finding of sexual dangerousness, these opinions did not state that this was because of a limitation in the scope of the statute. Further, these opinions are not instructions. They cannot substitute for instructions. It is the judge, not experts, who instructs the jury as to matters of law. Neither of the Commonwealth's witnesses testified as to what future behaviors, as defined by the Legislature, could be anticipated, let alone with any specific reasonable probability. The record lacks any testimony as to which sexual offenses the defendant was likely to commit. The only relevant testimony was the bare opinion by both of the Commonwealth's experts that the defendant had a personality disorder that made him likely to commit sexual offenses. The jurors were left to guess as to what future behaviors might constitute "sexual offenses" so as to commit the defendant as a sexually dangerous person.[7]

I therefore conclude that the insufficient instruction resulted in a substantial risk of a miscarriage of justice, and I would remand the case for a new trial. On remand, I should note, the jury could not be instructed by providing them with the entire list of "sexual offenses" defined by the statute, any more than a jury deciding a case of breaking and entering with intent to commit a felony may be provided with a list of all felonies. Indeed, given the powerful reactions that people may reasonably have to many of the offenses described, this would be unfairly prejudicial. Rather, the law, as noted, requires that any instruction be based upon the evidence as developed at trial, compare *Commonwealth* v. *Gonzalez*, 67 Mass. App. Ct. 877, 881 (2006) (judge not required to charge the jury on a specific theory of defense if there is no rational basis for it in the evidence), and should be the product of active conversation between the judge and counsel. Cf. 6A Wash. Prac., Wash. Pattern Jury Instr. Civ. WPI 365.16 (5th ed. 2005) (for similar statute, suggesting that analogue to "sexual offense" be defined with reference to the specific

---

[7]One might ask, "[J]ust what sexual offense do you imagine the jurors unanimously utilized in reaching their verdict?"

crimes the evidence suggests the defendant is "likely to commit in the future"). I say this mindful of the trial judge's primary role in formulating legal instructions specifically applicable to the particular issues and evidence in a case, as experienced during trial.

The failure to instruct the words "sexual offense" to the jury left them to their uninstructed imaginations in deciding this case, and thus created a substantial risk of a miscarriage of justice. I would reverse the judgment and remand for further proceedings.