NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-677

COMMONWEALTH

vs.

JEAN J. VILNO.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Following a jury trial in the Superior Court, the defendant, Jean J. Vilno, was convicted of trafficking a person for sexual servitude.[1]  He appeals, arguing error in the prosecutor's closing argument.  We affirm.

Background.  The jury could have found the following facts. The victim met the defendant in 2018, when she was twenty years old and living with her great grandmother.  At that time, she lost her full-time job and began using a profile on what she believed was a dating website.  She copied a "status" onto her profile that featured dollar signs and the phrase "pay to play."

---

[1] Prior to trial, the judge allowed the Commonwealth's motion to dismiss a second count of trafficking a person for sexual servitude.

She then realized the website was also used for "business" and deleted this status from her profile, but not before she received a message from someone named "Bluetooth": the defendant's profile name.

The defendant asked the victim "to come make some money in New York." Although she was skeptical to "go off with a stranger," she met up with the defendant anyway. The two discussed "business," modeling, and romance. The second time they met, they had sex. Before long the victim began to spend weekends at the defendant's house. The victim described their relationship as romantic for her but acknowledged that it was "probably business" from the start.

At the defendant's suggestion, the victim began having sex for money using an online profile that he created, "KitKat," which had previously been used by other women on the website. The profile featured a masked woman nude from the waist up; it was not a depiction of the victim. The defendant bought the victim a cell phone and installed applications on it. The victim was required to use the phone to communicate with clients and receive payments through applications, including Cash App and Venmo.[2] The victim did not keep any of the money and "would give it all to Bluetooth to hold." On one occasion, when the

---

[2] A forensic analyst testified that accounts for money transfer applications can be accessed from multiple devices.

2

victim tried to take twenty dollars for herself, the defendant assaulted her, resulting in her hospitalization.

The victim testified that the defendant "would do everything" for her, including controlling her phone,[3] posting website advertisements for her services, setting her prices, receiving payments from clients, supplying cocaine to her, and buying her food and shopping for her. The victim was unaware of any shared accounts with the defendant, but she believed that it was possible that the defendant had an account with "[her] name on it" because "he had all [of her] information."

The victim worked for the defendant for less than a year. It took multiple attempts for the victim to leave; she returned to him out of fear. When she successfully left in December 2018, the victim had no money as the defendant had it all.

As relevant here, when the police interviewed the defendant in March 2019, they retrieved from his person a bank card in the victim's name with the first name misspelled. Although the card was held as evidence, the defendant was not charged with any crimes directly related to the card.

Discussion. On appeal, the defendant claims multiple errors in the prosecutor's closing argument, some of which were

---

[3] When an angry client drove off with the cell phone, the defendant choked and beat the victim and replaced the phone the same day. The victim later gave this phone to the police.

preserved for appellate review, others were not.  For the preserved claims, we review for prejudicial error.  See Commonwealth v. Lester, 486 Mass. 239, 247 (2020).  For the unpreserved claims, we determine whether any error created a substantial risk of a miscarriage of justice.  See Commonwealth v. Renderos, 440 Mass. 422, 425 (2003).  In both cases, "[w]e view the challenged remarks in the light of the entire argument, as well as in light of the judge's instruction to the jury and the evidence [admitted] at trial" (quotations and citation omitted).  Id.

We begin with the preserved claim.  The defendant argues that he was prejudiced by the prosecutor's statement that "he [couldn't] even spell [the victim's] name right [on the bank card] when he [took] her identity."[4]  He objected, arguing that

---

[4] The prosecutor argued, in relevant part,

"[T]here was a question about whether or not there was a charge for a stolen credit card. . . .  We also agree, [the defense attorney] and I, based on the evidence, that [the victim's] name is spelled wrong on that [bank] card.  Common sense comes into play there.  How would [the victim] carry around a card that has her name spelled wrong?  You can't charge somebody for stealing a credit card that is actually their credit card.  And I suggest to you that it was [the defendant's] credit card, that he opened a credit card in [the victim's] name, and that he kept it.  Because, number one, why would he have it for months after [the victim left], just carrying it around in his pocket, if it wasn't something that he intended to use, if it wasn't something that he had control over."

4

the jury could not "infer that he tried to take over [the victim's] identity by possessing a card that didn't spell her name correctly." The defendant did not request a curative instruction. The prosecutor in turn clarified that it was fair to argue that the bank card did not belong to the victim based on her testimony that the defendant "had all of her information," "could create accounts," and possessed a "[bank card] that was in her misspelled name." In response, the judge instructed the jury:

> "during the closing arguments, there was a reference to the defendant possessing a bank card, . . . and a suggestion that[,] because of a misspelling [of] a name[,] that might suggest the defendant was assuming [the victim's] identity. <u>That bank card was admitted insofar as it shows the defendant's connection to [the victim] and access to or possession of a bank account or bank activity in her name</u>. But you're not to conclude from that, that the defendant was attempting to obtain or misuse [the victim's] identity." (Emphasis added.)

Taken in context, the prosecutor's statement was a permissible argument about the defendant's actions based on the evidence and

---

"And what did [the victim] tell you with regards to those text messages about this being a business, about her being a businesswoman. . . . [She said] this sounds like something I would say but I don't remember sending this [message]. I spell better than that, so I don't think that [message] is [mine]. She doesn't say I would never say it, she doesn't say I would never talk like that. She says I'm a better speller, end of story. And I would suggest to you, how do we know that maybe [the defendant] isn't such a great speller? <u>I'm going to circle back to that card where he can't even spell her name right when he takes her identity</u>" (emphasis added).

5

inferences fairly drawn therefrom.  See Commonwealth v. Cooper, 100 Mass. App. Ct. 345, 357 (2021).  The bank card was found on the defendant's person approximately three months after the victim had left him, and the victim's name was misspelled on it.  The victim testified that the defendant possessed all her personal information, took all her earnings, and to her knowledge, the two had no joint accounts.  It was therefore a fair inference that the card belonged to the defendant and that he had used the victim's name and personal information to open it.[5]  See Commonwealth v. Lao, 443 Mass. 770, 779 (2005), S.C., 450 Mass. 215 (2007) and 460 Mass. 12 (2011) (inferences need only be reasonable and possible, not necessary or inescapable).  In addition, the judge's instruction, which "follow[ed] shortly after closing argument and respond[ed] to the prosecutor's [objected-to] argument, mitigated [any possible] error" by clarifying the purpose for which the evidence was admitted.  Commonwealth v. Akara, 465 Mass. 245, 262 (2013).  We presume the jury followed those instructions.  See Commonwealth v. Kapaia, 490 Mass. 787, 799 (2022).

---

[5] For the same reason, we reject the defendant's unpreserved claim that the prosecutor misstated the evidence and referred to facts not in evidence when she argued that the defendant opened the bank card in the victim's name, possessed it, and had access to its funds.

The defendant claims for the first time on appeal that the judge's instruction was erroneous because there was no evidence that the defendant possessed or had access to a bank account in the victim's name.[6]  For the reasons addressed supra, this argument also fails.  In addition, reviewing the jury charge as a whole, see Commonwealth v. Trappaga, 76 Mass. App. Ct. 538, 546-547 (2010), the jury were instructed that closing arguments are not evidence.  We presume the jury followed those instructions.  See Kapaia, 490 Mass. at 799.  There was no error, let alone a substantial risk of a miscarriage of justice.  See Renderos, 440 Mass. at 425.

As to the remaining unpreserved claims, we begin by noting that the absence of an objection from trial counsel is some indication that, in context, the prosecutor's words were more innocuous than now argued.  See Commonwealth v. Mello, 420 Mass. 375, 380 (1995).  The defendant argues that the prosecutor's closing argument appealed to the jurors' sympathies, inflamed the passion of the jury, and employed rhetorical questions that shifted the burden of proof onto the defendant, thereby creating

---

[6] The defendant did not object to the challenged instruction and expressed satisfaction with it prior to jury deliberations.

a substantial risk of a miscarriage of justice.[7]  We are not persuaded.

First, the challenged statements were responsive to the defense attorney's arguments that the victim's credibility was "on trial," and that she was a "businesswoman" who ran a prostitution operation out of the defendant's home.  "A prosecutor is entitled to respond to an argument made by the defense at closing," Commonwealth v. Mason, 485 Mass. 520, 539 (2020), and the prosecutor in this case marshaled the evidence and explained, in response to the defense attorney's arguments to the contrary, why the victim's testimony was credible and should be believed.  See Commonwealth v. Gonsalves, 488 Mass. 827, 841 (2022), quoting Commonwealth v. Penn, 472 Mass. 610, 627 (2015), cert. denied, 578 U.S. 925 (2016) ("an advocate can 'provide the jury with the reasons why they should find a witness's observations to be accurate, but she cannot tell the jury that the witness speaks the truth'").  The prosecutor's references to the victim's age and precarious status in life, the details of her work for the defendant, and the control the

---

[7] To the extent that the defendant claims error in the prosecutor's argument that his access to and control over the bank card "[would] affect somebody's credit and their ability to leave and go out on their own," the prosecutor expressly asked the jury to employ their "common sense" to evaluate the evidence, and this was proper.  See Commonwealth v. Salazar, 481 Mass. 105, 117 (2018).

defendant exercised over her were also based on the evidence and fair inferences drawn therefrom.  See Lao, 443 Mass. at 779.

Finally, the prosecutor's rhetorical questions did not shift the burden of proof to the defendant.  In his closing argument, the defense attorney put the bank card at issue.[8]  He argued that the victim's testimony that she sent nude photographs of herself to prospective clients was "[c]ompletely inconsistent" with the allegation that she "was being trafficked."  The prosecutor was entitled to respond to these arguments, Mason, 485 Mass. at 539, and the challenged statements did just that.[9]  "[I]n light of the defendant's

_____

[8] The defense attorney argued, in relevant part,

"We've heard testimony today from the detective concerning what he recovered when they interacted with [the defendant].  It was either in February or March, his own words, and this was presented into evidence and it's interesting.  What was presented to you today was that they found on his person a bank card, a green bank card.  You can take this, it's an exhibit.  [The victim's] name is spelled incorrectly. . . .  When asked by me, you [detective sergeant] came to [the defendant's] home, you took [the card] from his person after your investigation, after your interview with [the victim].  Did you charge him with larceny of her card?  [The detective sergeant] testified no, I never charged him for larceny of the card.  Did you look into the card, did you ask [the victim] about the card?  Was that her card, did you go into the bank account, did you go into the history?  No, I didn't do that.  I just took the card and we held it into evidence."

[9] "How would [the victim] carry around a card that has her name spelled wrong?"; "Why would [the defendant] have [the bank card] in late February or early March if [the victim] had left

9

closing argument and in the context in which the questions were asked, the prosecutor's rhetorical questions could not have been perceived by the jury as shifting the Commonwealth's burden of proof to the defendant." Commonwealth v. Rogers, 43 Mass. App. Ct. 782, 786 (1997). See id., quoting Commonwealth v. Valentin, 420 Mass. 263, 274 (1995) ("'[t]he thrust of the [prosecutor's] argument was plainly apparent, and the jury could not have understood it for anything more than a rhetorical effort on the part of the prosecutor to explain' why the witness's testimony was indeed credible").

Viewing the challenged statements in the context of the whole closing argument, the jury instructions, and the strength of the Commonwealth's case, there was no error let alone a

---

in December?"; and "Why are there random photos of naked women on a phone?"

substantial risk of a miscarriage of justice.  See Renderos, 440

Mass. at 425.[10]

Judgment affirmed.

By the Court (Blake, C.J.,
  Meade & Tan, JJ.[11]),

Clerk

Entered:  March 19, 2026.

---

[10] Because we conclude that none of the challenged statements constituted error, we also reject the defendant's contention that the cumulative effect of any errors in the prosecutor's closing argument require a new trial.

[11] The panelists are listed in order of seniority.